**NORTH DAKOTA PUBLIC SERVICE COMMISSION, Petitioner,**

v.

**CENTRAL STATES GRAIN, INC., Respondent.**

**STATE of North Dakota ex rel. NORTH DAKOTA PUBLIC SERVICE COMMISSION as Trustee for the Benefit of OUTSTANDING RECEIPT HOLDERS OF CENTRAL STATES GRAIN, INC., Plaintiff and Appellee,**

v.

**MILLERS NATIONAL INSURANCE COMPANY, Defendant, Third-Party Plaintiff and Appellant,**

v.

**David HEPPLE and Mary A. Hepple, Third-Party Defendants.**

**Civ. Nos. 10800, 10801.**

Supreme Court of North Dakota.

July 22, 1985.

---

4. "[T]he evidence as a whole must establish the presumed fact beyond a reasonable doubt,....";

N.D.C.C. § 12.1–01–03(4)(b).

Daniel S. Kuntz, Asst. Atty. Gen., Bismarck, for plaintiff and appellee State of

North Dakota ex rel. North Dakota Public Service Commission.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for defendant, third-party plaintiff and appellant Millers Nat. Ins. Co.; argued by William A. Schlossman, Jr.

Fabian E. Noack, Carrington, for appellees-claimants Pete Florhaug, James Tenneson, Ray Walen and Wayne Ystaas.

ERICKSTAD, Chief Justice.

This appeal stems from insolvency proceedings commenced by the North Dakota Public Service Commission [PSC] against Central States Grain, Inc. [CSG]. Millers National Insurance Company [Millers], the surety on a warehouseman's bond naming CSG as principal, appeals from a district court judgment which ordered Millers to pay $195,637 plus interest, and costs not to exceed $3,063, into a trust fund created for the benefit of outstanding receipt holders of CSG. The judgment also ordered the PSC to disburse the money to approximately 40 claimants.

CSG, an Iowa corporation, was a licensed North Dakota grain warehouseman which operated a confectionary sunflower seed processing plant at Anselm during the license period between August 1, 1982, and July 31, 1983. CSG furnished a bond executed by Millers as surety in the penal sum of $275,000.

On July 27, 1983, CSG filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Iowa. At the time of the filing, CSG held in its Anselm facility a sunflower inventory that was subsequently liquidated by the bankruptcy trustee for which the trustee received approximately $430,000. The proceeds of the sale were placed in the bankruptcy account. The record reflects that a portion of these proceeds was paid to Commercial Credit Business Loans, the major lender of operating capital to CSG, which had perfected security interests in the receivables and inventory of CSG.

The PSC, also on July 27, 1983, filed an application in state district court for appointment as trustee of a trust fund for the benefit of outstanding receipt holders of CSG. CSG waived its right to a hearing and consented to the appointment of the PSC as trustee. The district court found CSG to be an insolvent grain warehouseman under the provisions of Chapter 60–04, N.D.C.C.,[1] and entered an order on August 16, 1983, approving the appointment of the PSC as trustee. The PSC published notice to persons who had received neither payment for nor redelivery of sunflowers from CSG, and received claims totaling $470,442 from 60 persons.

On November 29, 1983, the PSC served a summons and complaint against Millers requesting deposit of the penal sum of the warehouseman's bond into the trust fund. Millers brought a third-party action against David Hepple, the president of CSG, and his wife, Mary Hepple, seeking indemnity for any liability incurred as a consequence of the issuance of the bond.[2] The PSC's action against Millers was consolidated with the insolvency proceedings.

The PSC filed its trustee's report and recommendations with the district court on January 19, 1984. The PSC recommended that claims totaling $194,795 be paid from the trust fund and that the balance of the claims, representing $275,647, be denied. The PSC also recommended that Millers be ordered to deposit the funds necessary to pay the approved claims, plus interest and PSC expenses, into the trust fund.

1. The parties agree that, because the transactions giving rise to the claims in these proceedings took place prior to July 1, 1983, this case is governed by the grain warehouseman statutes in effect prior to July 1, 1983. Chapters 60–02 and 60–04, N.D.C.C., have undergone substantial revision by the 1983 and 1985 Legislatures. Unless otherwise indicated, all citations are to the statutes in effect prior to July 1, 1983.

2. The Hepples subsequently filed for relief under the United States Bankruptcy Code. Thus, the proceedings against the Hepples in this case were automatically stayed under 11 U.S.C. § 362(a).

At the first hearing on the PSC's motion to approve the report and recommendations, the PSC and Millers presented a proposed stipulation of facts, which categorized the claimants as follows:

*NSF Checks.* Some of the claimants delivered sunflowers to the warehouse and received checks from CSG for payment. These checks were not honored. The amount of the dishonored checks totals $34,490.

The PSC recommended that these claimants be paid, and Millers did not dispute that these claimants were entitled to participate in the trust fund and were subject to coverage under the warehouseman's bond.

*Unamended Grower Contracts.* Prior to its insolvency, CSG entered into "Sunflower Grower Contracts" with many producers for the future purchase of sunflowers. One of the two forms of the Sunflower Grower Contracts provides:

"The grower shall receive payment within 30 days for the delivered portion of the crop upon completion of delivery and acceptance in accordance with the terms and conditions of this contract."

These contracts provided for a purchase price of $12.50 per cwt. The total amount of claims by persons entering into these agreements totals $104,561.

The PSC recommended that these claims be paid, and Millers asserted that these claimants are not eligible to participate in the trust fund, and are excluded from bond coverage because they entered into "deferred payments contracts or other credit arrangements" under § 60–02–09(7), N.D. C.C.

*Amended Grower Contracts.* The payment provision on some of the Sunflower Grower Contracts was amended by terms which were stamped on the reverse side of the contract:

"The grower shall receive payment in three installments for the delivered portion of the crop upon completion of delivery and acceptance in accordance with the terms and conditions of this contract. The grower shall receive ⅓ payment within 30 days, ⅓ payment on January 31, 1983 and ⅓ payment on March 31, 1983. Interest shall be paid to the grower at the annual rate of 15% on the unpaid balance commencing on January 1, 1983."

These contracts provided for a purchase price of $13 per cwt. None of the producers who entered into these contracts received any payments.

The PSC recommended that only the first payment due under the contract was eligible for reimbursement from the trust fund. These claims total $5,190. Millers asserted that these persons are excluded from bond coverage by virtue of § 60–02–09(7), N.D. C.C.

Claims for the second and third payments due under the amended grower contracts total $222,883. The PSC and Millers agreed that these latter payments are not entitled to bond coverage.

*Scale Tickets.* Some of the claimants delivered sunflowers to CSG pursuant to no written agreements. They received only scale tickets from CSG evidencing their deliveries. These claims total $28,930.

The PSC recommended payment of these claims, while Millers asserted that because these claimants did not receive instruments evidencing immediate right to payment on the date they sold and delivered sunflowers to CSG, they are neither entitled to participate in the trust fund nor to coverage under the warehouseman's bond.

*Nonstandard Form Contracts.* Two of the claimants delivered sunflowers to CSG pursuant to written contracts other than Sunflower Grower Contracts. One of the contracts was between CSG and Robert Bartholomay. It provided the terms of payment to be "NCRI." Bartholomay's claim totals $1,059.

The other contract is between Farmer's Sunflowers, Inc. and CSG. The terms of payment under that contract were "net 30 days." The total amount of the claim under this contract is $12,257.

The PSC recommended payment of both claims. Millers asserted that neither is entitled to participate in the trust fund nor is subject to coverage under the bond.

*Bernstein Claim.* Laverne Bernstein entered into an amended Sunflower Grower Contract to sell 2,400 cwt. of sunflowers for $13 per cwt. He delivered a portion of the sunflowers on January 1, 1983, and received a partial payment. Bernstein and CSG subsequently agreed to a payment of $956 for the unpaid balance. He did not receive this payment. Bernstein made further deliveries to CSG, which were not made pursuant to the contract, and received only scale tickets for these deliveries. The total amount of Bernstein's claim is $4,969. On July 19, 1983, CSG gave Bernstein a vaculator machine in satisfaction of all amounts due him. The vaculator was demanded to be returned by the bankruptcy trustee as a preferential transfer.

The PSC recommended that Bernstein's claim be allowed. Millers asserted that the payment due under the Sunflower Grower Contract should not be allowed because it is barred by § 60–02–09(7), N.D.C.C. Millers also asserted that the balance of Bernstein's claim should be denied for the same reasons that it contends that amounts due to persons who received only scale tickets should not be allowed. Millers alternatively argued that Bernstein's claim should be disallowed absent evidence that he received no value by virtue of the transfer of the vaculator.

*Schander Claim.* Rodney and Gilbert Schander delivered sunflowers to CSG on December 8, 1982, pursuant to an unamended Sunflower Grower Contract. In May 1983, CSG issued a check to the Schanders for $4,177 to pay for the delivery. The check was dishonored.

The PSC recommended that the claim be paid. Millers asserted that because the Schanders did not receive the check contemporaneously with delivery of their sunflowers, their claim is barred by § 60–02–09(7), N.D.C.C.

The district court ordered that the stipulation be circulated to all interested parties and set a hearing for April 30, 1984 to hear objections to the stipulation and the trustee's report and recommendations. At the hearing, the stipulation was introduced in evidence and several witnesses testified. The district court approved all of the PSC's recommendations and also granted a motion made on behalf of Wayne Ystaas to approve his claim for $1,151. Judgment was entered on May 22, 1984, from which Millers appeals.

I

Millers contends that the district court could not properly enter judgment against it as surety until the PSC recovered CSG's inventory or the proceeds therefrom and included it in the trust fund. At the time CSG filed for bankruptcy, it held raw and processed inventory at its Anselm facility. The inventory was liquidated by the bankruptcy trustee and the proceeds of approximately $430,000 were placed in the bankruptcy account. The district court determined that "[t]here appears no reasonable basis upon which the Commission could have maintained a successful action before the bankruptcy court for the reclamation of grain inventory held at CSG's warehouse in Anselm at the time of the company's bankruptcy and insolvency."

It is clear that the PSC never came into possession of CSG's sunflower inventory in this case. CSG filed its petition in bankruptcy court on July 27, 1983. The district court order appointing the PSC trustee under state insolvency law was entered on August 16, 1983. Because CSG filed its bankruptcy petition prior to the entry of any state court order interfering with CSG's right to possession of the sunflower inventory, CSG, rather than the PSC as trustee, had a possessory interest in, and control of, the inventory as of the commencement of the bankruptcy proceedings. *See State of Missouri v. U.S. Bankruptcy Court for the E.D. of Arkansas,* 647 F.2d 768, 774 n. 12 (8th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d

318 (1982).[3] CSG's possessory and ownership interests in the inventory triggered preliminary jurisdiction over the property in the bankruptcy court. *See State of Missouri, supra*, 647 F.2d at 774. As a result, the sunflower inventory had become part of the bankruptcy estate and may have already been liquidated by the bankruptcy trustee at the time the district court appointed the PSC to serve as trustee.

Millers nevertheless asserts that under North Dakota law[4] the PSC had a duty to collect through the bankruptcy court the sunflower inventory proceeds. Millers' argument continues that because the interests of the producers under the trust established by Chapter 60–04, N.D.C.C., are superior to those of any secured creditor [*see North Dakota Public Service v. Valley Farmers*, 365 N.W.2d 528, 539–540 (N.D. 1985)], and because there was sufficient sunflower inventory to cover all valid claims, Millers should not be liable for any amount in these proceedings. The PSC asserts that it has no authority under the law to maintain an action to collect grain proceeds in a bankruptcy proceeding, but that the producers must file their own claims and represent their own interests. The PSC also asserts that Millers is in a better position to obtain the proceeds from the bankruptcy court[5] because the PSC would have no standing to assert the interests of individual producers and because of Millers' right to subrogation or assignment

of the producers' claims in the bankruptcy proceeding. *See generally In re Woerner*, 19 B.R. 708, 711 (Bkrtcy.D.Kan.1982) [11 U.S.C. § 509(a), which grants to a third party a right of subrogation to the creditor's claim when payments on behalf of the debtor are actually made, applies to sureties.]

■ The power to resolve priorities and competing claims to property belonging to the debtor in a bankruptcy proceeding rests with the bankruptcy court rather than this court. *See In re State of Missouri*, 7 B.R. 974, 980 (E.D.Ark.1980), *aff'd sub nom., State of Missouri v. U.S. Bankruptcy Court for the E.D. of Arkansas*, 647 F.2d 768 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982). The bankruptcy court also has the exclusive jurisdiction to determine the rightful owner of a claim. *Matter of Paul R. Dean Co., Inc.*, 460 F.Supp. 452, 455 (W.D.N.Y.1978). Given the circumstances of this case, whether or not the PSC would have standing to assert the interests of the producers in the bankruptcy proceedings, and, assuming that it would have standing, whether or not it could successfully obtain from the bankruptcy court the entire proceeds of the sale of inventory at the Anselm facility, are open to question. *See State of Missouri, supra*. Millers' liability or lack thereof under our state warehouse insolvency laws cannot be predicated upon its assumptions of what might have result-

---

3. In *State of Missouri, supra*, the court held that proceedings instituted by Missouri to enforce a provision of its grain laws empowering the state to operate and liquidate insolvent grain warehouses did not fall within the police or regulatory power exception to the automatic stay under 11 U.S.C. § 362(b)(4).

4. Millers relies on §§ 60–02–25 and 60–04–09, N.D.C.C., which provide in pertinent part:

"*60–02–25. Bailment not a sale—Insolvency.*— ... Such grain first shall be applied at all times, in the event of the failure or insolvency of such bailee, exclusively to the redemption of outstanding warehouse receipts for grain so stored with such bailee, and in such event all grain on hand in any particular elevator or warehouse, whether the same is stored or not, shall be applied to the satisfaction of receipts issued by such warehouse."

"*60–04–09. Report of trustee to court—Approval—Distribution.*—Upon recovery of the trust fund mentioned in section 60–04–06, or so much thereof as possible or as shall be necessary to redeem all outstanding receipts, the commission shall file its report ..."

We note also that in *North Dakota Public Service v. Valley Farmers*, 365 N.W.2d 528, 536 (N.D.1985), we stated that the PSC, as trustee of the trust fund created under Chapter 60–04, N.D.C.C., has "a duty to protect and preserve the trust assets and to defend actions which may result in loss to the trust, unless under all of the circumstances it is reasonable not to make such defense."

5. We have been informed that Millers has filed a claim with the bankruptcy court.

ed had the PSC asserted a questionable claim in an Iowa bankruptcy court. Millers has not established to this court that the PSC would have had such a high probability of success before the bankruptcy court that its failure to act in this instance constituted a violation of any of its asserted duties.

■ Section 60–04–02(3), N.D.C.C., provides that the trust fund shall consist of, among other things, "[t]he cause of action for damages upon any bond given by said warehouseman to the state of North Dakota to insure faithful performance of his duties as a warehouseman; ..." Where, as in this case, there is in effect no "grain in said warehouse" [§ 60–04–02(1), N.D.C.C.] at the time the PSC is appointed trustee, the PSC may seek to recover the penal sum of the warehouseman's bond for inclusion in the trust fund. We conclude that under the circumstances of this case, the district court had the authority to enter judgment against Millers even though the PSC took no steps to attempt to recover the proceeds of the sale by the bankruptcy trustee of CSG's sunflower inventory.

## II

Millers asserts that the district court erred in determining that the unamended Grower Contracts which provided for payment "within 30 days" after delivery did not constitute "deferred payments contracts or other credit arrangements" within the meaning of § 60–02–09(7), N.D.C.C., and that the producers who entered into these agreements were therefore not excluded from bond coverage.[6] The version of § 60–02–09(7), N.D.C.C., which was in effect at the time the transactions giving rise to these proceedings took place, provided:

"*60–02–09. Bond filed by track buyer or public warehouseman.* Before any license is issued to any public warehouseman or track buyer under this chapter,

the applicant for such license shall file a bond with the commission which shall:

\* \* \* \* \* \*

"7. Not accrue to the benefit of any person entering into deferred payments contracts or other credit arrangements with a track buyer or public warehouseman."

Millers asserts that the term "credit arrangement" construed in its ordinary sense should be interpreted to include any transaction in which a seller agrees to deliver goods to a buyer other than for a contemporaneous right to payment. Millers also asserts that the determination of what constitutes a deferred payment contract or other credit arrangement is solely a question of law and that the parties' understandings of the agreements are totally irrelevant.

■ This court rejected similar arguments in *North Dakota Public Service v. Valley Farmers*, 365 N.W.2d 528 (N.D. 1985), and concluded that whether or not a sales agreement falls within the purview of 60–02–09(7), N.D.C.C., does not depend merely upon an examination of whether or not a time delay exists between delivery and payment. Rather, we held that "whether or not a transaction constitutes a deferred payment contract or other credit arrangement depends not only on a delay in payment following delivery, but also on the expectations and intentions of the parties to the agreement." *Valley Farmers, supra,* 365 N.W.2d at 544. We also held that under the principle of ejusdem generis, the phrase "or other credit arrangements" does not expand the meaning of "deferred payments contracts." *Valley Farmers, supra,* 365 N.W.2d at 545. The expectations and intentions of the parties may be established by the course of dealing between the parties and the usage of trade within the industry. *See In re Samuels & Co., Inc.,* 510 F.2d 139 (5th Cir.1975), *reversed en banc on other grounds,* 526 F.2d 1238 (5th Cir.), *cert. denied sub nom.,*

6. Millers agrees that this class includes the claim of Farmer's Sunflowers, Inc. and the claim of Rodney and Gilbert Schander.

*Stowers v. Mahon,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

Section 41–01–15(1–205), N.D. C.C., provides in pertinent part:

"*41–01–15. (1–205) Course of dealing and usage of trade.*

"1. A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

"2. A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

"3. A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement."

This statute requires that a contract for the sale of goods be interpreted in light of the commercial background of the transaction. *Urbana Farmers Union Elevator Co. v. Schock,* 351 N.W.2d 88, 92 (N.D. 1984). Courts have regarded the established practices and usages within a particular trade or industry as a more reliable indicator of the true intentions of the parties. *Urbana Farmers Union Elevator Co., supra.* The existence and scope of such a practice or usage is to be determined by the trier of fact. *Urbana Farmers Union Elevator Co., supra.*

The district court made the following findings of fact:

"12. It is common within the confectionary sunflower industry for a delay to exist between actual physical delivery of the sunflower seeds to a purchaser such as a licensed warehouseman and the receipt of payment for such delivery even though the parties consider the sale arrangement a cash transaction. Such delays are necessary in many instances because of the time required to perform certain tests to determine the quality or grade of the sunflower seeds. In some instances such tests may be performed by an independent third party such as a federal grain inspector. The delay between delivery and payment is often a week or longer.

"13. Under the Sunflower Grower Contracts the delivery location was designated as the grower's farm. CSG maintained its corporate headquarters at Des Moines, Iowa, and checks issued for the payment of grain delivered to Anselm were issued from Des Moines, Iowa. Because of CSG's practice of taking delivery at the grower's farm and issuing checks in payment of that delivery from Des Moines, a time delay between delivery and payment was necessary and growers could not expect immediate payment. Growers had received payment from CSG for deliveries made pursuant to unamended Sunflower Grower Contracts in approximately two weeks. The provisions of the Sunflower Grower Contract providing that the grower shall receive payment *within* 30 days for the delivered portion of the crop were consistent with CSG's delivery and payment practices. [Emphasis in original.]

"14. Deferred payment arrangements for the sale of grain are usually made to defer the income of the sale from one taxable year to a succeeding taxable year. Other credit arrangements are usually entered into in exchange for a

higher sales price or the payment of interest during the credit period.

"15. The growers entering into unamended Sunflower Grower Contracts with CSG did not intend to extend credit to CSG. The growers considered such sales to be cash transactions rather than credit arrangements.

\*　·　\*　　\*　　\*　　\*　　\*

"17. The potential 30 day time delay between delivery and receipt of payment contained in the provisions of CSG's contracts existed to accommodate any necessary testing as well as CSG's delivery and payment practices rather than as an extension of credit.

"18. The established course of dealing between CSG and sellers of sunflower seed to CSG was that sales in which payment was to be received within 30 days were cash sales.

"19. The usage of trade within the confectionary sunflower industry is that sales of sunflower seeds in which payment is to be received within a reasonable period of time after delivery are cash sales. Considering the delivery and payment practices of CSG, payment within 30 days of delivery is a reasonable length of time."

■ Millers contends that the trial court's findings are erroneous because not all of the claimants testified. Millers asserts that the only appropriate findings the court could make under the circumstances would be with respect to those producers who actually testified at the hearing. We reject this contention.

The unamended Grower Contracts were identical. The trial testimony was given by three claimants, one of whom operated a farm and a grain elevator and had bought and sold confectionary sunflowers as a warehouse operator since 1970. These claimants testified as to the usage of trade in the industry, their course of dealing with

CSG, and their intentions regarding the nature of the Sunflower Grower Agreements. Millers offered no contradictory evidence from any of the sellers or CSG personnel as to the intent of the parties, or from a sunflower industry representative as to the usage of trade within the industry. In view of the undisputed evidence, we conclude that the district court could properly find that the course of dealing and usage of trade was not unique to the particular witness testifying but applied to all similarly situated claimants.

■ We have reviewed the record and conclude that the trial court's findings relating to course of dealing, usage of trade, and the intent of the parties to the unamended Grower Contracts are supported by the evidence. Rule 52(a), N.D.R.Civ.P. The unamended Grower Contracts providing for payment "within 30 days" of delivery did not constitute "deferred payments contracts or other credit arrangements" within the meaning of § 60–02–09(7), N.D. C.C., and the unpaid producers who entered into these agreements are therefore entitled to bond coverage.

### III

Some of the claimants in this proceeding entered into Sunflower Grower Agreements with an amended payment provision stamped on the reverse side of the document. The amended payment provision provided that the grower "shall receive ⅓ payment within 30 days, ⅓ payment on January 31, 1983 and ⅓ payment on March 31, 1983" with 15 percent interest on the unpaid balance commencing January 1, 1983. The district court ruled that the initial payment did not constitute a credit arrangement and that those claimants who delivered grain to CSG and did not receive the initial payment were valid receipt holders and claimants "to the extent of such unpaid initial payment." The district court also held that the second and third payments due under the contract did constitute a credit arrangement and that Millers was

not liable for those payments.[7] Millers asserts that the district court erred in determining that the initial payment was subject to bond coverage.

To accept Millers' argument that § 60–02–09(7), N.D.C.C., does not differentiate between the treatment afforded an initial installment payment and those subsequently deferred would preclude a producer who received at the time of delivery his first payment in the form of a check, which is later dishonored, from participating in the trust fund. We do not believe that this was the intent of the Legislature. We have already concluded that those producers who entered into the unamended Grower Contracts providing for payment "within 30 days" did not enter into deferred payment contracts or other credit arrangements within the meaning of § 60–02–09(7), N.D.C.C. The initial payment provision in the amended Grower Contracts contains identical language. We conclude that the district court did not err in determining that the initial payment was not considered as a credit arrangement and that the producers who did not receive that payment are entitled to bond coverage.

Even if we were to conclude that the statute does not differentiate in the treatment accorded an initial installment under such a contract, we held in *Valley Farmers, supra*, 365 N.W.2d at 546, that a surety is liable to producers who enter into deferred payment contracts or other credit arrangements without *written* notice in the contract that they would be giving up their rights to bond coverage. The amended Grower Contracts contain no such provision.

We conclude that the district court did not err in allowing the claimants who entered into the amended Grower Contracts from recovering the initial payment from the trust fund.

## IV

Some of the claimants who delivered sunflowers to CSG received only scale tickets as evidence of their deliveries.[8] Although these deliveries were not made pursuant to a written sales agreement, the bankruptcy trustee testified, and the district court found, that these sunflowers were delivered for sale rather than for storage. Millers asserts that because these persons "authorized" a time delay between delivery and their right to receive payment, they entered into deferred payment contracts or other credit arrangements and therefore are not entitled to bond coverage. We disagree.

In *Valley Farmers, supra*, 365 N.W.2d at 545, 548, we held that a grain warehouseman's failure to convert scale tickets into either cash or storage tickets as required by § 60–02–11, N.D.C.C., does not result in a loss to the producers, but constitutes a violation by the warehouseman of § 60–02–09(4), N.D.C.C., for which the surety is liable. Millers presented no evidence of an agreement that the sales by these claimants were intended to be credit arrangements with CSG. We have found nothing in the record to suggest that these claimants were to receive payment for their deliveries in anything other than the usual course of business. The district court found that it is common in the confectionary sunflower industry for a delay of a week or longer to exist between delivery and payment, and that these incidental delays are considered cash rather than credit transactions.

We conclude that the district court properly allowed the claimants who had only scale tickets as evidence of their deliveries to participate in the trust fund.

## V

Millers asserts that the district court, by allowing the claims of persons who sold

---

7. Millers and the PSC agree that the second and third payments due under the amended Grower Contracts are not covered by the warehouseman's bond. No party to this appeal has challenged the denial of these claims. We therefore do not address the propriety of the district court's denial of this category of claims.

8. Millers agrees that this class includes the claim of Robert Bartholomay.

grain to CSG under written contracts, who sold grain and received only scale tickets as evidence of delivery, and who received checks which were later dishonored, erroneously extended the scope of the trust fund established under Chapter 60–04, N.D.C.C., far beyond that which is allowed by statute. Relying on §§ 60–02–09, 60–04–02, and 60–04–09, N.D.C.C., Millers contends that the trust fund, and a surety's liability under a warehouseman's bond, extends only to persons who hold storage receipts and only to sellers who received cash slips or checks. We decline to give our warehouseman statutes such a narrow interpretation.

In *Valley Farmers, supra,* 365 N.W.2d at 544, we quoted as follows from *State v. Hoover Grain Co.,* 63 N.D. 344, 352, 248 N.W. 275, 278 (1933):

" 'It is clearly the intent of the Legislature, however, that this law shall be comprehensive enough to settle the legitimate demands of owners of grain delivered to an insolvent elevator company, against those who have liability because of such grain—an insurance company in case grain is destroyed, *a surety on a bond in case grain is not paid for,* and those liable for the conversion of the grain. The law was intended for the benefit of the claimants, and must be construed with sufficient liberality to effectuate its purpose without doing injury to those who are liable.' " [Emphasis added.]

■ The overriding purpose of requiring warehouseman's bonds is to protect all persons who sell or deliver grain to a warehouseman. *Valley Farmers, supra,* 365 N.W.2d at 546; *Larkin v. Wheat Growers Warehouse Co.,* 64 N.D. 491, 253 N.W. 757 (1934). Section 60–02–09(3), N.D.C.C., specifically provides that a warehouseman's bond shall "[r]un to the state of North Dakota for the benefit of all persons storing or selling grain in such warehouse." A surety's liability on a bond is conditioned on the faithful performance of a public warehouseman's duties under the law. Section 60–02–09(4), N.D.C.C., *Valley*

*Farmers, supra.* We believe it to be beyond dispute that one of a warehouseman's duties under the law is to pay for the grain that it has purchased.

■ We conclude that the trust fund exists for the benefit of all unpaid sellers of grain regardless of whether they hold "cash slips" or "checks," and that the surety's liability under a warehouseman's bond extends to those unpaid sellers unless the unpaid seller had knowingly entered into a deferred payment contract or other credit arrangement within the meaning of § 60–02–09(7), N.D.C.C. To limit the scope of the trust fund to the extent urged by Millers would be inimical to the law's purpose of settling the legitimate demands of those producers who store or sell grain with an insolvent warehouseman.

## VI

■ At the hearing on March 27, 1984, the district court allowed a claim to be filed by Wayne Ystaas. Millers asserts that because Ystaas failed to file his claim within the time period specified in § 60–04–04, N.D.C.C., he should be barred from participating in the trust fund. Section 60–04–04, N.D.C.C., provides:

"*60–04–04. Notice to receipt holders.* —Upon its appointment as trustee, the commission shall be entitled to the possession of all the books and records of such warehouseman required by law to be kept by him and shall take possession peaceably or by appropriate action of such books and records and of all grain on hand in such warehouse and thereupon shall procure the delivery to it of all receipts shown to be outstanding by the books of said warehouseman for the purpose of enforcing the provisions of this chapter. *If the commission cannot ascertain the names and addresses of all of such receipt holders, or if it shall be unable to procure the possession of all said receipts, or shall have reason to believe that all such receipts have not been surrendered to it, the commission shall publish a notice in a legal newspaper in the county in which such*

*warehouse is situated for three successive weeks requiring such receipt holders to surrender their receipts.* Unless within ninety days after the last publication of the notice such receipts are surrendered to the commission, such receipt holders shall be barred from participation in said fund, and the commission may proceed as though it were the owner of all the stored grain in such warehouse." [Emphasis added.]

The publication procedure which triggers the running of the 90-day time period for filing claims is not a mandatory procedure, but is necessary only if the PSC cannot ascertain the names and addresses of all receipt holders or is unable to procure possession of all receipts. In the present case, Ystaas was not an unknown receipt holder but was listed by the PSC as a claimant from the beginning of the proceedings after its examination of CSG's books and records. In addition, although Millers did not stipulate that Ystaas' claim be allowed, Millers and the PSC did stipulate and therefore acknowledge that Ystaas did have a claim for $741. Under these circumstances, we conclude that the district court did not err in allowing Ystaas to file his claim at the hearing.

Millers also asserts that the district court erred at the April 30, 1984 hearing by allowing Ystaas to increase the stipulated amount of his claim by approximately $400. The district court allowed Ystaas to testify and introduce evidence supporting the increased claim. Millers did not object to allowing Ystaas to testify or to the introduction of the evidence and Millers was given the opportunity to cross-examine Ystaas concerning the merits of his requested increase. Millers asserts in effect that because Ystaas' written objection to the proposed stipulation of facts did not specify that Ystaas was entitled to an additional amount on his claim, it was "surprised" by the additional amount requested and was not prepared to meet the claim at the hearing.

 A judgment will not ordinarily be reversed on appeal for surprise at the trial, where no request is made for a continuance at the time and there is no showing of inability to meet the situation. *Macumber v. Gillett,* 138 Neb. 714, 294 N.W. 854, 857 (1940). The district court's finding that CSG and Ystaas agreed to increase the amount due to Ystaas by $410 as an adjustment to the moisture levels and drying charges assessed against his deliveries is supported by the evidence. We conclude that under the circumstances of this case the court did not err in increasing the amount of Ystaas' claim.

## VII

With regard to the claim of Laverne Bernstein, Millers asserts that he should be treated as a producer who entered into an amended Grower Contract or as a producer who received only scale tickets as evidence of his deliveries. We have already concluded that both of these categories of claimants are entitled to participate in the trust fund.

Millers asserts in the alternative that Bernstein's claim should be disallowed because he was paid in full for his claims by virtue of his receipt of the vaculator machine from CSG. The district court concluded that because the agreement between CSG and Bernstein for Bernstein to accept the vaculator as full payment for his claims was voided by the bankruptcy trustee under 11 U.S.C. § 547, he became a valid receipt holder and claimant in this case.

 Under principles of bankruptcy law, the recipient of a preferential transfer does not automatically regain status as a valid creditor of the debtor upon the trustee's declaration that the transfer is void or voidable. Pursuant to 11 U.S.C. § 502(d), claims of creditors who have received void or voidable preferences must be disallowed unless the creditor surrenders the money or property transferred during the preference period. *In re First Intern. Services Corp.,* 37 B.R. 856, 860 (Bkrtcy.D.Conn. 1984); *Matter of Moriarty,* 22 B.R. 689, 690 (Bkrtcy.D.Neb.1982). In this case, the

district court specifically found that "[t]he vaculator was ... demanded by but not delivered to the trustee in the bankruptcy proceedings of CSG." Because the record certified to this court does not establish that Bernstein either paid for or returned the vaculator to the bankruptcy trustee, we conclude that the district court erred in allowing Bernstein's claim.

The PSC has presented, as an addendum to its brief in this court, a copy of an affidavit of Bernstein not of record in this proceeding indicating that he has since paid the bankruptcy trustee for the vaculator. This court will not take cognizance of evidence by affidavit presented for the first time after the appeal is perfected. *State v. Jacobson*, 156 N.W.2d 70, 71 (N.D.1968). However, we have recently stated that "where a substantial change of evidence takes place between the initial trial and our disposition, the trial court is not precluded by the 'law of the case' doctrine from making new findings in proper circumstances." *City of Minot v. Freelander*, 368 N.W.2d 514, 518 (N.D.1985). Bernstein may bring an appropriate motion for relief from the judgment after our mandate is issued. *See Freelander, supra.*

## VIII

Millers asserts that the district court erred in ordering Millers to reimburse the PSC for its "out-of-pocket" expenses incurred in the performance of its duties as trustee. We disagree. The PSC is entitled to reimbursement for reasonable expenses incurred in administering the trust fund established under Chapter 60–04, N.D.C.C. *Valley Farmers, supra,* 365 N.W.2d at 548–549.

Millers appears to contend that the district court erred in awarding the PSC expenses not to exceed $3,063, because the only evidence presented by the PSC indicated expenses of $2,463. However, the document Millers refers to lists expenses incurred by the PSC prior to December 31, 1983. Millers has not persuaded us that the district court's allowance of an additional $600 for PSC expenses in administer-

ing the trust fund after that date is unreasonable.

The judgment of the district court is reversed with regard to its approval of Laverne Bernstein's claim, affirmed in all other respects and remanded for disposition pursuant to this opinion.

GIERKE and MESCHKE, JJ., PEDERSON, Surrogate Justice, and SCHMALENBERGER, District Judge, concur.

PEDERSON, Surrogate Justice, and SCHMALENBERGER, District Judge, sitting in place of VANDE WALLE and LEVINE, JJ., disqualified.