2003 ND 104

**PUBLIC SERVICE COMMISSION,**
Petitioner and Appellee,

v.

**WIMBLEDON GRAIN CO., Respondent,**

v.

**Mike Clemens, Individually and on Behalf of Other Creditors, Intervenors and Appellants,**

**Employers Mutual Casualty Company, Intervenor and Appellee,**

and

**Security State Bank of North Dakota, Intervenor and Appellee.**

No. 20020274.

Supreme Court of North Dakota.

June 17, 2003.

William W. Binek, Special Assistant Attorney General, Bismarck ND, for petitioner and appellee.

Sarah Vogel (argued), Beth A. Baumstark (appeared) and Courtney Koebele (on brief), Wheeler Wolf, Bismarck, ND, for intervenors and appellants.

Lowell P. Bottrell (argued) and Adam W. Hamm (on brief), Anderson & Bottrell, Fargo, ND, for intervenor and appellee Employers Mutual Casualty Company.

Richard P. Olson (argued) and Wanda L. Fischer (on brief), Minot, ND, for intervenor and appellee Security State Bank of North Dakota.

KAPSNER, Justice.

[¶ 1] Mike Clemens, and specified members of the Wimbledon Grain Farmers Group (collectively "WGFG"), appealed from a declaratory judgment holding that WGFG members could not participate in a trust fund established after the Wimbledon Grain Company became insolvent and that the Public Service Commission ("Commission") was not obligated to marshal trust fund assets for their benefit. We conclude the trial court did not abuse its discretion in certifying the judgment as final under N.D.R.Civ.P. 54(b). We further conclude the trial court erred in ruling WGFG members are not "claimants" entitled to participate in the non-bond assets of the trust fund under N.D.C.C. § 60–02.1–30, and in ruling the Commission is not obligated to marshal trust fund assets for their benefit under N.D.C.C. § 60–02.1–34. We reverse and remand.

I

[¶ 2] Wimbledon Grain Company ("Wimbledon Grain") was a North Dakota grain elevator with facilities in Leal and Wimbledon. Wimbledon Grain was licensed by the Commission as a grain buyer under N.D.C.C. ch. 60–02.1, and was licensed by the Farm Service Agency of the United States Department of Agriculture as a grain warehouse under 7 U.S.C. §§ 241–256. On January 11, 2002, Wimbledon Grain released all grain inventories, operating equipment and grain records to the Farm Service Agency, and on January 14, 2002, Wimbledon Grain advised the Commission it was unable to redeem receipts and scale tickets from farmers who had sold it grain. The Commission was appointed by the trial court to be trustee of the trust fund established for claimants under N.D.C.C. § 60–02.1–30. The trial court allowed Security State Bank of North Dakota ("Bank"), Wimbledon Grain's primary lender, and Employers Mutual Casualty Company ("Mutual"), the surety on the bond submitted by Wimbledon Grain for its grain buyer license, to intervene. WGFG, comprised of farmers who had entered into credit-sale contracts

with Wimbledon Grain payable beyond 30 days, were also allowed to intervene.

[¶ 3] In response to published notices of Wimbledon Grain's insolvency, 181 farmers filed claims totaling $4,279,796.47. In April 2002, the United States Attorney filed a complaint in interpleader on behalf of the Farm Service Agency in United States District Court. The Farm Service Agency liquidated Wimbledon Grain's grain assets and placed the $2,936,140.11 in proceeds in an interest bearing account. Cargill, Inc. was allowed to deposit with the Commission in an interest bearing account $716,718.33 that it owed Wimbledon Grain for purchased grain. Archer Daniels Midland Company was also allowed to deposit with the Commission in an interest bearing account $829,005.15 that it owed Wimbledon Grain for purchased grain.

[¶ 4] During the course of the state court and federal court proceedings, the Commission grouped claimants into five categories. Category 1 claimants consisted of farmers who made cash sales or who had signed credit-sale contracts with payment due within 30 days of the date of insolvency. Category 2 claimants consisted of farmers who had storage contracts with Wimbledon Grain. Category 3 claimants consisted of farmers who had unsigned or delayed price or deferred payment contracts. Category 4 claimants consisted of farmers who had forged, delayed price or deferred payment contracts. Category 5 consisted of WGFG members who had credit-sale contracts payable beyond 30 days. Category 1 claimants were paid, with interest, by the Commission. Claimants in categories 2, 3 and 4 were paid in full, with interest, through the companion federal court action.

[¶ 5] The Commission refused to recognize WGFG members as valid claimants to the trust fund under N.D.C.C. § 60–02.1–30, because they had sold grain through credit-sale contracts payable beyond 30 days. In its report and recommendation to the trial court, the Commission explained:

The unsecured claims are credit-sale contracts pursuant to which the sale price is to be paid or may be paid more than thirty days after the delivery or release of grain for sale. Credit-sale contracts are not included in the definition of "receipts" under N.D.C.C. §§ 60–02.1–01(8) and 60–02.1–32 to qualify for payment under the trust fund and are not eligible for bond coverage under N.D.C.C. § 60–02.1–08(7).

[¶ 6] WGFG members moved in state court for a declaratory judgment that they were valid claimants to the trust fund and that the Commission was required to marshal the trust fund assets on their behalf. The trial court agreed with the Commission, concluding WGFG members who entered into credit-sale contracts with Wimbledon Grain payable more than 30 days after delivery or release of grain for sale were not "claimants" entitled to the protection of the trust fund, and that the Commission was not obligated to marshal trust fund assets on their behalf. The trial court ordered $472,749.70 plus any accrued interest transferred to the Farm Service Agency's account in the federal court proceedings, retained jurisdiction over pending issues, and granted WGFG's request for a N.D.R.Civ.P. 54(b) certification authorizing an immediate appeal of the declaratory judgment ruling. WGFG members appealed.

II

[¶ 7] Rule 54(b), N.D.R.Civ.P., authorizes a trial court to enter a final judgment adjudicating fewer than all of the claims or the rights and liabilities of fewer than all of the parties upon "express determination that there is no just reason

for delay" and "express direction for the entry of judgment." We are not bound by a trial court's Rule 54(b) certification, and we review the court's decision under the abuse of discretion standard. *Klagues v. Maintenance Eng'g*, 2002 ND 59, ¶ 28, 643 N.W.2d 45. A trial court abuses its discretion if it acts in an unreasonable, arbitrary, or unconscionable manner, or if its decision is not the product of a rational mental process, or when it misinterprets or misapplies the law. *Id.* at ¶ 6.

[¶ 8] A party seeking Rule 54(b) certification must establish extraordinary circumstances or that, absent review, unusual hardship would occur. *Nodak Mut. Farm Bureau v. Kosmatka*, 2000 ND 210, ¶ 7, 619 N.W.2d 852. Trial courts must consider the strong policy against piecemeal appeals and must delineate the unusual or compelling circumstances requiring interlocutory appellate review. *Id.* at ¶ 8. Because of our aversion to rendering advisory opinions, a trial court generally abuses its discretion in granting a Rule 54(b) certification if future developments in the trial court may moot the issues raised for appellate review. *Hansen v. Scott*, 2002 ND 101, ¶¶ 10–11, 645 N.W.2d 223.

[¶ 9] The trial court found the circumstances in this case were "unusual, compelling and out of the ordinary." The court reasoned, "[t]he legal question of whether or not members of WGFG could be construed to be 'claimants,' and thus beneficiaries of the trust fund established under N.D.C.C. 60–02.1–30 is a substantial question affecting broad interests and will constitute a final resolution regarding the status of the members of WGFG." The court further noted, "the resolution of the question certified will have the effect of settling substantial claims of the WGFG, which will experience substantial hardship with a delayed resolution of the certified question."

[¶ 10] Mutual argues the trial court erred in granting the Rule 54(b) certification because there is a possibility the issues raised in this appeal could be rendered moot by future developments in the related federal court proceedings. On November 29, 2002, the federal district court requested the Commission, the Farm Service Agency, and WGFG to "prepare supplemental briefing on the issue of whether there is any conceivable way in which [members of WGFG] may be given any priority interest in the res." Because possible theories might arguably exist under which WGFG members could recover the remaining portion of the res in federal court, Mutual contends the issues in this appeal could become moot.

[¶ 11] The state trial court ruled WGFG members cannot participate in the trust fund established under N.D.C.C. § 60–02.1–30, and the Commission has no duty to marshal the trust fund assets on their behalf. This is a final adjudication of their claims in state court. The res in federal court contains grain proceeds of approximately $500,000, an amount sufficient to satisfy less than one-half of the more than $1 million of claims submitted by WGFG's 38 members. The grain proceeds constitute only one of a number of categories of assets that can be included in the trust fund and marshaled by the Commission. Even if the res in federal court were ordered to be paid to WGFG members, WGFG members would still have more than $500,000 in unsatisfied claims, and the Commission would have no obligation to attempt to marshal additional trust fund assets on their behalf.

[¶ 12] We agree that dissipation of the trust fund assets will cause unusual and substantial hardship to WGFG members in this case. Payment to WGFG members of the res in federal court would lessen this hardship, but would not eliminate it. Any

potential federal court action would not moot the issue of the Commission's duty to marshal trust fund assets on behalf of WGFG members. Under the circumstances in this case, we conclude the trial court did not abuse its discretion in granting the Rule 54(b) certification. *Compare Krank v. A.O. Smith Harvestore Prod.,* 456 N.W.2d 125, 127 n. 1 (N.D.1990) (holding trial court did not abuse its discretion in granting Rule 54(b) certification after weighing juridical concerns of possible mootness against countervailing equitable factors of substantial hardship).

## III

[¶ 13] WGFG argues the trial court erred in ruling its members are not "claimants" entitled to the protection of the trust fund and the Commission had no obligation to marshal trust fund assets for their benefit.

## A

[¶ 14] A brief summary of the statutory scheme is helpful before addressing the arguments of the parties.

[¶ 15] Grain warehouses that are licensed by the Farm Service Agency of the United States Department of Agriculture under 7 U.S.C. §§ 241–256, must also obtain a license from the Commission under N.D.C.C. ch. 60–02.1 for grain merchandising activities. *See* N.D.C.C. § 60–02.1–07. Enacted in 1999, N.D.C.C. ch. 60–02.1 authorizes the Commission to exercise general supervision of grain buyers. An insolvency occurs "when the licensee defaults in payment for grain purchased or marketed by the licensee." N.D.C.C. § 60–02.1–28. Upon the insolvency of a licensee, N.D.C.C. § 60–02.1–29 requires that the Commission apply to the district court of

Burleigh County "for authority to take all action necessary to act as trustee of the trust fund described in section 60–02.1–30."

Trust fund established. Upon the insolvency of any licensee, a trust fund must be established for the benefit of claimants and to pay the costs incurred by the commission in the administration of the insolvency. The trust fund must consist of the following:

1. Nonwarehouse receipt grain of the insolvent licensee held in storage or the proceeds obtained from the conversion of such grain.

2. The proceeds, including accounts receivable, from any grain sold from the time of the filing of the claim that precipitated an insolvency until the commission is appointed trustee must be remitted to the commission and included in the trust fund.

3. The proceeds of insurance policies on destroyed grain.

4. The claims for relief, and proceeds therefrom, for damages upon bond given by the licensee to ensure faithful performance of the duties of a licensee.

5. The claim for relief, and proceeds therefrom, for the conversion of any grain stored in the warehouse.

6. Unencumbered accounts receivable for grain sold prior to the filing of the claim that precipitated an insolvency.

7. Unencumbered equity in grain hedging accounts.

8. Unencumbered grain product assets.

N.D.C.C. § 60–02.1–30.[1] Upon its appointment, the Commission has the duty to

---

1. A trust fund is also established under N.D.C.C. ch. 60–04, which governs insolvent grain warehousemen. Section 60–04–03.1, N.D.C.C., establishes a trust fund "for the

"marshal all of the trust fund assets" and "may maintain suits in the name of the state of North Dakota for the benefit of all claimants against the licensee's bonds, insurers of grain, any person who may have converted any grain, and any who may have received preferential treatment by being paid by the insolvent licensee after the first default." N.D.C.C. § 60–02.1–34.

[¶ 16] The bond referred to in N.D.C.C. § 60–02.1–30(4), which must be filed by a grain buyer with the Commission before a license will issue, shall "[n]ot accrue to the benefit of any person entering into a credit-sale contract with a grain buyer." N.D.C.C. § 60–02.1–08(7). A "credit-sale contract" is "a written contract for the sale of grain pursuant to which the sale price is to be paid or may be paid more than thirty days after the delivery or release of the grain for sale and which contains the notice provided in subsection 7 of section 60–02.1–14." N.D.C.C. § 60–02.1–01(2). Each credit-sale contract must contain "[n]otice in a clear and prominent manner that the sale is not protected by the bond coverage provided for in section 60–02.1–08." N.D.C.C. § 60–02.1–14(7).

[¶ 17] The Commission is required to publish notice of its appointment and "may notify, by ordinary mail, potential claimants disclosed by the licensee's records." N.D.C.C. § 60–02.1–32. The notice "must require claimants to file their claims with the commission along with the receipts or other evidence of the claims required by the commission." *Id.* "Receipts" are defined as "scale tickets, checks, or other memoranda given by a grain buyer for, or as evidence of, the receipt, storage, or sale of grain except when such memoranda was received as a result of a credit-sale con-

tract." N.D.C.C. § 60–02.1–01(8). If claimants do not timely file a claim, the Commission "is relieved of further duty in the administration of the insolvency on behalf of the claimant and the claimant may be barred from participation in the trust fund." N.D.C.C. § 60–02.1–32. A claimant's remedies are circumscribed by N.D.C.C. § 60–02.1–33:

> Remedy of claimants. No claimant has a separate claim for relief upon any insolvent licensee's bond, nor for insurance, nor against any person converting grain, nor against any other claimant, except through the trustee, unless, upon demand of five or more claimants, the commission fails or refuses to apply for its own appointment or unless the district court denies the application. Provisions of this chapter do not prohibit any claimant, either individually or in conjunction with other claimants, from pursuing concurrently any other remedy against the person or property of the licensee.

[¶ 18] The Commission must file with the court "a report showing the amount and validity of each claim," which "must also contain the proposed distribution of the trust fund assets, less expenses incurred by the commission in the administration of the insolvency." N.D.C.C. § 60–02.1–37. Upon "appropriate notice," the court must set a hearing "for interested persons to show cause why the commission's report should not be approved and distribution of the fund be made as proposed." *Id.* Following a hearing on the objections of aggrieved persons, "the court shall approve or modify the report and issue an order directing payment of the necessary bond proceeds, distribution of

---

benefit of receiptholders of the insolvent warehouseman." The categories of trust fund assets are similar to those specified in N.D.C.C. § 60–02.1–30, except that the first

category consists of "[t]he grain in the warehouse of the insolvent warehouseman or the proceeds as obtained through the sale of such grain." N.D.C.C. § 60–04–03.1(1).

the trust fund, and discharge of the commission from its trust." *Id.*

### B

[¶ 19] The Commission, Bank, and Mutual (collectively "Commission") argue that anyone can be a claimant against the trust fund under N.D.C.C. ch. 60–02.1, but the relevant inquiry is whether the person making the claim has a valid claim. Because the definition of "receipts" under N.D.C.C. § 60–02.1–01(8) specifically excludes memoranda received as the result of a credit-sale contract, the Commission argues claimants who hold credit-sale contracts are precluded from participating in the trust fund. WGFG members argue the trust fund is specifically established for the benefit of "claimants," rather than "receiptholders," under N.D.C.C. § 60–02.1–30. Because N.D.C.C. § 60–02.1–32 provides that any claims must be accompanied by "receipts or other evidence of the claims," WGFG members argue a valid claim is not limited by the definition of "receipts" under N.D.C.C. § 60–02.1–01(8), and therefore can include claims based on credit-sale contracts. WGFG members recognize they are unable to recover from any bond proceeds that may become a part of the trust fund because of the prohibition in N.D.C.C. § 60–02.1–08(7), but argue they are eligible to recover from the other categories of assets that can become part of the trust fund under N.D.C.C. § 60–02.1–30.

[¶ 20] Issues involving the application and interpretation of statutes are questions of law fully reviewable by this Court. *Nelson v. Johnson,* 1999 ND 171, ¶ 7, 599 N.W.2d 246. In construing N.D.C.C. ch. 60–02.1, our duty is to ascertain the Legislature's intent, which initially must be sought from the statutory language itself, giving it its plain, ordinary, and commonly understood meaning.

N.D.C.C. §§ 1–02–02 and 1–02–03. If statutory language is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit, because the Legislature's intent is presumed clear from the face of the statute. N.D.C.C. § 1–02–05. If statutory language is ambiguous, a court may resort to extrinsic aids, including legislative history, to interpret the statute. N.D.C.C. § 1–02–39. A statute is ambiguous if it is susceptible to meanings that are different, but rational. *Shiek v. North Dakota Workers Comp. Bureau,* 2002 ND 85, ¶ 12, 643 N.W.2d 721.

[¶ 21] Statutes must be construed as a whole and harmonized to give meaning to related provisions, and are interpreted in context to give meaning and effect to every word, phrase, and sentence. *Meljie v. North Dakota Workers Comp. Bureau,* 2002 ND 174, ¶ 15, 653 N.W.2d 62; *Doyle ex rel. Doyle v. Sprynczynatyk,* 2001 ND 8, ¶ 10, 621 N.W.2d 353. We presume the Legislature did not intend an absurd or ludicrous result or unjust consequences. *McDowell v. Gillie,* 2001 ND 91, ¶ 11, 626 N.W.2d 666. We construe statutes in a practical manner and give consideration to the context of the statutes and the purposes for which they were enacted. *Grey Bear v. North Dakota Dep't of Human Servs.,* 2002 ND 139, ¶ 7, 651 N.W.2d 611. The law relating to grain insolvencies was intended for the benefit of claimants, and must be construed with sufficient liberality to effectuate its purpose of settling the legitimate demands of owners of grain delivered to an insolvent elevator without doing injury to those who are liable. *See North Dakota Pub. Serv. Comm'n v. Central States Grain, Inc.,* 371 N.W.2d 767, 779 (N.D.1985); *North Dakota Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n,* 365 N.W.2d 528, 544 (N.D.1985); *State v.*

*Hoover Grain Co.,* 63 N.D. 344, 352, 248 N.W. 275, 278 (1933).

[¶ 22] The term "claimant" is not defined for purposes of N.D.C.C. ch. 60–02.1. Because "claimant" is not defined in that chapter, we apply the term's plain, ordinary, and commonly understood meaning. *Security State Bank v. Orvik,* 2001 ND 197, ¶ 9, 636 N.W.2d 664. A "claimant is one who claims or asserts a right or demand." *Weisgerber v. Workmen's Comp. Bureau,* 70 N.D. 165, 171, 292 N.W. 627, 630 (1940); *see also Webster's Third New International Dictionary* 414 (1971); *Black's Law Dictionary* 241 (7th ed.1999). This commonly understood meaning is similar to the statutory definition of a "claimant" in N.D.C.C. ch. 60–03, which relates to hay buyers. *See* N.D.C.C. § 60–03–01(1) (defining "claimant" as "any person claiming to be injured by the default of the licensee in the payment for any hay purchased or marketed by the licensee"). Under the plain meaning of the term, a claimant is a person who asserts a right to payment for grain sold to a licensee, and, in this case, includes WGFG members.

[¶ 23] The Commission agrees anyone can be a claimant, but argues WGFG members cannot be considered claimants entitled to participate in the trust fund because their claims are invalid. *See Valley Farmers Bean Ass'n,* 365 N.W.2d at 536 (distinguishing between "claimant" and "receiptholder" under N.D.C.C. ch. 60–04, and holding if Commission "has a good faith reasonable belief that a claimant is not a valid receipt holder and that the claim is therefore adverse to the trust, it is under no duty to advocate the asserted interests of that claimant"). The Commission contends that the term claimant should be interpreted to mean a "receiptholder" as that term is used in N.D.C.C. chs. 60–02 and 60–04. The Commission argues the obvious purpose of N.D.C.C.

§ 60–02.1–01(8) is to define what may be included as a receipt for purposes of making a valid claim against the trust fund in case of an insolvency. Because credit-sale contracts are specifically exempted from the definition of "receipts" under N.D.C.C. § 60–02.1–01(8), the Commission argues WGFG members have no valid claim against the trust fund and are not valid claimants under the law.

[¶ 24] There are flaws in the Commission's argument. Although credit-sale contracts do not fall within the definition of "receipts" under N.D.C.C. § 60–02.1–01(8), it is apparent, when other provisions of N.D.C.C. ch. 60–02.1 are considered, that the Legislature did not limit claims to only those claims supported by "receipts." Under N.D.C.C. § 60–02.1–32, the Commission must give notice and "require claimants to file their claims with the commission along with the receipts *or other evidence of the claims* required by the commission." (Emphasis added). The term "or" is disjunctive in nature and ordinarily indicates an alternate between different things or actions. *See Narum v. Faxx Foods, Inc.,* 1999 ND 45, ¶ 20, 590 N.W.2d 454. Therefore, by use of the term "or," the Legislature indicated that a claim may be supported by "receipts," or, in the alternative, by "other evidence of the claims."

[¶ 25] The Commission argues that the definitional reference to "receipts" as "other memoranda given by a grain buyer for, or as evidence of, the receipt, storage, or sale of grain" in N.D.C.C. § 60–02.1–01(8) should be read in conjunction with the language requiring claimants to file "receipts or other evidence of the claims" in N.D.C.C. § 60–02.1–32. According to the Commission, it is the definition of "receipts" that excludes persons with credit-sale contracts from participating in the trust fund. The Commission's argument

might be persuasive if N.D.C.C. § 60–02.1–32 stated "receipts or other evidence of *receipts*," but the statute says "receipts or other evidence of the *claims*." (Emphasis added). The Commission's argument renders meaningless the language, "or other evidence of the claims" in N.D.C.C. § 60–02.1–32. If the Legislature had intended only "receipts" or other evidence of "receipts" to be eligible to participate in the trust fund, we believe it would have used more precise language to illustrate that point. The ordinary meaning of the statutory language establishes that a claim can be supported by evidence that does not qualify as a receipt under N.D.C.C. § 60–02.1–01(8).

[¶ 26] We reject the Commission's argument that if credit-sale contract holders are entitled to share in trust fund assets, the language in N.D.C.C. § 60–02.1–01(8) excluding credit-sale contracts from the definition of "receipts" would have no meaning. The Legislature has not said persons who enter into credit-sale contracts are not entitled to participate in the trust fund, but has made it clear that only the bond filed with the commission under N.D.C.C. § 60–02.1–08(7) must "[n]ot accrue to the benefit of any person entering into a credit-sale contract with a grain buyer." The notice required by N.D.C.C. § 60–02.1–14(7) likewise refers only to a lack of bond coverage for holders of credit-sale contracts. Because the bond constitutes only one of the eight specifically enumerated categories of trust fund assets under N.D.C.C. § 60–02.1–30, we believe the definition of "receipts" in N.D.C.C. § 60–02.1–01(8) comports with the notion that persons entering into credit-sale contracts are entitled to participate in assets of the trust fund other than the bond. We recognize that, under N.D.C.C. § 60–02–25.1, "[g]rain contained in a warehouse, including grain owned by the warehouseman, is subject to a first priority lien in favor of outstanding receiptholders stor-ing, selling, or depositing grain in the warehouse," and that this lien "shall be preferred to any lien or security interest in favor of any creditor of the warehouseman." While this statute clarifies that holders of credit-sale contracts have no lien priority over receiptholders, it does not indicate credit-sale contract holders are not entitled to participate in non-bond assets of the trust fund.

[¶ 27] The Commission relies on this Court's decision in *Central States Grain, Inc.* to support its contention that unpaid holders of credit-sale contracts cannot be claimants to the trust fund. However, in *Central States Grain, Inc.*, 371 N.W.2d at 778 n. 7, the Commission and the surety on the bond agreed certain credit-sale payments were not covered by the warehouseman's bond, and this Court did not address whether the district court's denial of the claims was proper. The issue whether credit-sale contract holders could be valid claimants to non-bond assets of the trust fund was neither raised nor addressed in that case.

[¶ 28] The Commission also relies on legislative history purportedly establishing that the protections available to farmers selling grain under N.D.C.C. ch. 60–02.1 were intended to mirror protections available to farmers under N.D.C.C. chs. 60–02 and 60–04, rather than to expand coverage provided to credit-sale contract holders. We believe the challenged statutes in N.D.C.C. ch. 60–02.1 are clear and unambiguous. "[W]hen a statute is clear and unambiguous it is improper for courts to attempt to go behind the express terms of the provision so as to legislate that which the words of the statute do not themselves provide." *Schaefer v. North Dakota Workers Comp. Bureau*, 462 N.W.2d 179, 182 (N.D.1990). *See also* N.D.C.C. § 1–02–05. In *Little v. Tracy*, 497 N.W.2d 700, 705 (N.D:1993), this Court said:

Generally, the law is what the Legislature says, not what is unsaid. . . .

It must be presumed that the Legislature intended all that it said, and that it said all that it intended to say. The Legislature must be presumed to have meant what it has plainly expressed. It must be presumed, also, that it made no mistake in expressing its purpose and intent. Where the language of a statute is plain and unambiguous, the "court cannot indulge in speculation as to the probable or possible qualifications which might have been in the mind of the legislature, but the statute must be given effect according to its plain and obvious meaning, and cannot be extended beyond it."

*City of Dickinson v. Thress,* 69 N.D. 748, 290 N.W. 653, 657 (1940) (citations omitted). Usually, when the plain meaning of a statute is apparent, it is unwise and unnecessary to delve further.

Consequently, we will not correct an alleged legislative "oversight" by rewriting unambiguous statutes to cover the situation at hand.[2] *Selzler v. Selzler,* 2001 ND 138, ¶ 18, 631 N.W.2d 564. Because the challenged statutes are unambiguous, we give no deference to the Commission's interpretation of them. *See Sprynczynatyk,* 2001 ND 8, ¶¶ 10–12, 621 N.W.2d 353; N.D.C.C. § 1–02–39(6).

[¶ 29] We conclude that WGFG members with unpaid credit-sale contracts with the insolvent grain buyer are "claimants" entitled to participate in the non-bond assets of the trust fund under N.D.C.C. § 60–02.1–30.

## C

[¶ 30] Because WGFG members are valid claimants entitled to participate in the non-bond assets of the trust fund, the Commission is obligated to marshal the non-bond trust fund assets for their benefit under N.D.C.C. § 60–02.1–34. We express no opinion on priorities to the non-bond trust fund assets.

## IV

[¶ 31] The judgment is reversed and the case is remanded.

[¶ 32] DALE V. SANDSTROM, Acting C.J., WILLIAM F. HODNY, S.J., MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

[¶ 33] The Honorable WILLIAM F. HODNY, Surrogate Judge, sitting in place of VANDE WALLE, C.J., disqualified.

---

**2.** The 58th Legislative Assembly recently passed, and the Governor signed, H.B. 1197, which amends numerous provisions of N.D.C.C. chs. 60–02.1 and 60–04, and creates a new chapter concerning credit-sale contracts. *See* 2003 N.D. Sess. Laws ch. 548. Section 3 of the bill amends N.D.C.C. § 60–02.1–30 to replace the term "claimants" with "noncredit-sale receiptholders." Sections 4, 5, 6, 7, and 8 of the bill amend N.D.C.C. §§ 60–02.1–31, 60–02.1–32, 60–02.1–33, 60–02.1–34, and 60–02.1–35, respectively, to replace reference to "claimants" with "receiptholders." Section 11 of the bill amends N.D.C.C. § 60–04–03.1 to add "noncredit-sale" before the term "receiptholders." Section 12 of the bill creates a "credit-sale contract indemnity fund" funded by an assessment of two-tenths of one percent on the value of all grain sold in this state under a credit-sale contract. Persons are eligible to be reimbursed up to $280,000 from the fund if, after August 1, 2003, the person sells grain to a licensed warehouse or grain buyer in this state under a credit-sale contract, the warehouse or grain buyer becomes insolvent, and the warehouse or grain buyer does not fully compensate the person in accordance with the credit-sale contract.