2008 ND 184

**PUBLIC SERVICE COMMISSION,**
Petitioner and Appellee

v.

**MINNESOTA GRAIN,**
**INC., Respondent**

and

Hartford Fire Insurance Company,
Respondent and Appellee

Jim Broten, Eric Broten, and Broten
Farms, Appellants.

No. 20080068.

Supreme Court of North Dakota.

Oct. 22, 2008.

Rehearing Denied Nov. 19, 2008.

William W. Binek, Special Assistant Attorney General, Bismarck, ND, for petitioner and appellee.

John J. McDonald (argued) and Rodger Allen Hagen (on brief), Meagher & Geer, PLLP, Minneapolis, MN, for respondent and appellee.

Sarah M. Vogel (argued) and Derrick L. Braaten (appeared), Sarah Vogel Law Firm, P.C., Bismarck, ND, for appellants.

Gary R. Wolberg, Fleck, Mather & Strutz, Bismarck, ND, for amicus curiae North Dakota Grain Dealers.

CROTHERS, Justice.

[¶ 1] Jim Broten, Eric Broten, and Broten Farms (collectively "Brotens") appeal from a district court order arising in connection with insolvency proceedings commenced by the North Dakota Public Service Commission ("PSC") against Minnesota Grain, Inc. ("Minnesota Grain"). The district court found Minnesota Grain was an insolvent grain warehouseman under N.D.C.C. ch. 60–04 and appointed the PSC to serve as trustee of the trust fund created for the benefit of Minnesota Grain receiptholders. Brotens appeal from the district court order approving the trustee's report and discharging the trustee, which determined Brotens' claims were ineligible for benefits under the trust fund. We affirm, holding the PSC did not err in concluding that Brotens were not entitled to payment from the trust fund established under N.D.C.C. ch. 60–04.

I

[¶ 2] In 2001, the PSC issued a public warehouse license under N.D.C.C. ch. 60–02 to Minnesota Grain of Eagan, Minnesota, to operate a grain warehouse in Rhame, North Dakota. Minnesota Grain obtained the requisite bond under N.D.C.C. § 60–02–09 from Hartford Fire Insurance Co. ("Hartford Fire"), initially in the amount of $75,000. In 2003, this bond amount was increased to $100,000. Minnesota Grain also had a facility in East Grand Forks, Minnesota, which was neither licensed nor bonded as a warehouse under North Dakota law.

[¶ 3] In March 2007, the PSC applied to the district court for an order finding Minnesota Grain insolvent, appointing the PSC as trustee of the Minnesota Grain estate, and joining the surety Hartford Fire as a respondent in the action. In April 2007, the court granted the PSC's application. In June 2007, the PSC, acting as trustee, filed its report and recommendation with the court for approval. The PSC's report in part rejected five claims, including Brotens' claims, as ineligible for N.D.C.C. ch. 60–04 protections, because their grain had been sold and delivered to the Minnesota Grain facility in East Grand Forks, Minnesota. Specifically, the PSC's report and recommendation stated:

"8. The Commission recommends that the five claims in the total amount of $467,920.69 for grain purchased by Minnesota Grain, Inc. through its East

Grand Forks, Minnesota [facility] for delivery to East Grand Forks, Minnesota be denied. Claims for purchases of grain made by Minnesota Grain, Inc. through its East Grand Forks, Minnesota facility are Minnesota transactions that must be submitted to the Minnesota Department of Agriculture to be determined under Minnesota law. The surety bond on file with the Commission covers only grain purchases made by Minnesota Grain, Inc. through its Rhame North Dakota facility licensed under North Dakota law."

[¶ 4] The PSC also stated in its report and recommendation that there were no grain assets in the Minnesota Grain estate and that the $100,000 surety bond on file with the PSC was "needed to redeem outstanding claims for grain purchased for cash by Minnesota Grain, Inc. through its Rhame, North Dakota facility." Regarding these purchases, the PSC report stated that payments to valid claimants would be prorated for payment with available funds from the bond proceeds and that each claimant would receive "approximately 30% of its valid claim," but that there were insufficient funds to pay interest on the claims.

[¶ 5] In August 2007, Brotens filed an objection to the approval and adoption of the PSC's report, which determined Brotens' claims were ineligible for payments under the trust fund. Brotens requested the court reject the PSC's report and recommendation. In an affidavit submitted with Brotens' objection, Jim Broten stated that Brotens began selling barley to Minnesota Grain after he had received calls at his farm near Dazey, North Dakota, around harvest time in 2005 from Minnesota Grain officials. Broten said that grain was initially picked up from the Broten farms with Minnesota Grain trucks, but that after "about June 2006,"

Minnesota Grain asked Jim Broten to deliver the grain using his trucks because Minnesota Grain was "short of trucks." Broten received a greater price per bushel to cover trucking costs, but was sometimes paid separately for freight. Minnesota Grain, however, occasionally sent its own trucks.

[¶ 6] Regardless of who hauled the grain, all barley sold by Brotens to Minnesota Grain was delivered to the Minnesota Grain facility in East Grand Forks, Minnesota, where the grain was re-weighed and graded, and Broten received scale tickets. Broten later received purchase settlement statements from "Minnesota Grain, Inc.— EGF Elevator," bearing an East Grand Forks address. Broten stated the barley was processed at the East Grand Forks mill into pearled barley or barley flour. Broten asserts he never agreed to store grain in Minnesota and all transactions with Minnesota Grain were outright sales.

[¶ 7] On August 20, 2007, the district court held a hearing, and additional briefing was permitted. In January 2008, the district court approved the PSC's report and recommendation, upholding Brotens' ineligibility. In its memorandum opinion, the court explained:

"[Brotens] assert their claims should be included and be eligible for any payments from the trust fund in this case. The Court agrees with the PSC's analysis that the bond required under N.D.C.C. § 60–02–09 applies only to warehouses licensed in North Dakota. N.D.C.C. § 60–02–07 requires a license must be obtained for each public warehouse in operation in this state, and N.D.C.C. § 60–02–09(3) provides for the bond to run to the State for the benefit of persons storing or selling grain in the warehouse. Thus, the statute requires that the bond benefit persons storing or selling grain in such warehouse, and the

facts are undisputed that Broten[s] ... did not store or sell grain in the [Rhame] elevator."

The district court further concluded, "The bond covers the warehouse operated by Minnesota Grain at Rhame, North Dakota. Neither the statutes nor the warehouse bond extend coverage to sales made by the North Dakota growers to facilities owned by the [sic] Minnesota Grain outside of North Dakota."

## II

[¶ 8] The dispositive issue is whether Brotens are "noncredit-sale receiptholders of the insolvent warehouseman" entitling them to payment by the PSC from the trust fund created under N.D.C.C. § 60–04–03.1.

### A

[¶ 9] Generally, "[s]tatutory interpretation is a question of law and fully reviewable on appeal." *Farmers Union Mut. Ins. Co. v. Associated Electric & Gas Ins. Servs. Ltd.*, 2007 ND 135, ¶ 9, 737 N.W.2d 253. "Words in a statute are given their plain, ordinary, and commonly understood meaning, unless defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1–02–02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1–02–07." *Farmers Union*, at ¶ 9 (quotations omitted). This Court "harmonize[s] statutes when possible to avoid conflict between them." *See Haugenoe v. Workforce Safety & Ins.*, 2008 ND 78, ¶ 8, 748 N.W.2d 378.

[¶ 10] "Our interpretation of a statute 'must be consistent with legislative intent and done in a manner [to further] the policy goals and objectives of the statutes.'" *Haugenoe*, 2008 ND 78, ¶ 8, 748 N.W.2d 378 (quoting *Rojas v. Workforce Safety and Ins.*, 2006 ND 221, ¶ 13, 723

N.W.2d 403). "We presume the Legislature did not intend an unreasonable result or unjust consequence." *Id.* (quotation omitted). Further, this Court has explained, "The law relating to grain insolvencies was intended for the benefit of claimants, and must be construed with sufficient liberality to effectuate its purpose of settling *the legitimate demands of owners of grain delivered to an insolvent elevator* without doing injury to those who are liable." *Public Service Comm'n v. Wimbledon Grain Co.*, 2003 ND 104, ¶ 21, 663 N.W.2d 186 (emphasis added) (citing *North Dakota Pub. Serv. Comm'n v. Central States Grain, Inc.*, 371 N.W.2d 767, 779 (N.D.1985); *North Dakota Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n*, 365 N.W.2d 528, 544 (N.D.1985); *State v. Hoover Grain Co.*, 63 N.D. 344, 352, 248 N.W. 275, 278 (1933)).

### B

[¶ 11] Chapter 60–04, N.D.C.C., addresses insolvent grain warehousemen and provides "an insolvency procedure designed to provide a prompt method for receipt holders to recover their claims." *North Dakota Public Serv. Comm'n v. Jamestown Farmers Elevator, Inc.*, 422 N.W.2d 405, 407 (N.D.1988) (internal quotation omitted). Section 60–04–02, N.D.C.C., which establishes when a warehouseman is considered insolvent, states: "A *licensee* is insolvent when the *licensee* refuses, neglects, or is unable upon proper demand to make payment for grain purchased or marketed by the *licensee* or to make redelivery or payment for grain stored." (Emphasis added.) Upon any warehouseman's insolvency, N.D.C.C. § 60–04–03, provides that the PSC "shall apply to the district court of a county in which the warehouseman *operates a licensed warehouse* for authority to take all action necessary and appropriate to secure

and act as trustee of the trust fund described in section 60–04–03.1." (Emphasis added.)

[¶ 12]   Section 60–04–03.1, N.D.C.C., establishes the trust fund to be administered by the PSC and states:

"Upon the insolvency of any warehouseman, a trust fund shall be established *for the benefit of noncredit-sale receipt-holders of the insolvent warehouseman* and to pay the costs incurred by the commission in the administration of this chapter.   The trust fund must consist of the following:

1.   The grain in the warehouse of the insolvent warehouseman or the proceeds as obtained through the sale of such grain.

2.   The proceeds, including accounts receivable, from any grain sold from the time of the filing of the claim that precipitated an insolvency until the commission is appointed trustee must be remitted to the commission and included in the trust fund.

3.   The proceeds of insurance policies upon grain destroyed in the elevator.

4.   *The claims for relief, and proceeds therefrom, for damages upon any bond given by the warehouseman to ensure faithful performance of the duties of a warehouseman.*

5.   The claim for relief, and proceeds therefrom, for the conversion of any grain stored in the warehouse.

6.   Unencumbered accounts receivable for grain sold prior to the filing of the claim that precipitated an insolvency.

7.   Unencumbered equity in grain hedging accounts.

8.   Unencumbered grain product assets."

*Id.* (emphasis added).   Section 60–04–03.1, N.D.C.C., thus describes the assets comprising the trust fund administered by the PSC for the benefit of receiptholders.   In this case, however, the PSC determined there were no grain assets in the Minnesota Grain estate and the main asset for the PSC's administration was the bond given by Minnesota Grain for its facility in Rhame, North Dakota.   *See* N.D.C.C. §§ 60–02–09;   60–04–03.1(4);   *see also* N.D.C.C. §§ 60–04–07 (giving PSC power to prosecute and compromise claims) and 60–04–09 (providing for trustee's report, court approval, and distribution of trust fund).   As we explained in *Central States Grain*, 371 N.W.2d at 779:

"The overriding purpose of requiring warehouseman's bonds is to protect all persons who sell or deliver grain to a warehouseman. *Valley Farmers, supra,* 365 N.W.2d at 546; *Larkin v. Wheat Growers Warehouse Co.,* 64 N.D. 491, 253 N.W.·757 (1934).   Section 60–02–09(3), N.D.C.C., specifically provides that a warehouseman's bond shall '[r]un to the state of North Dakota for the benefit of all persons storing or selling grain in such warehouse.'   A surety's liability on a bond is conditioned on the faithful.performance of a public warehouseman's duties under the law.   Section 60–02–09(4), N.D.C.C., *Valley Farmers, supra.*   We believe it to be beyond dispute that one of a warehouseman's duties under the law is to pay for the grain that it has purchased."

[¶ 13]   This case, however, presents the unique situation where the only asset in the PSC's trust fund for distribution is the warehouse bond for Minnesota Grain's Rhame facility, but the Brotens' grain sales to Minnesota Grain were found by the PSC, and approved by the district court, to have been made to Minnesota Grain's East Grand Forks facility.

## C

[¶ 14] Brotens argue they are entitled to benefit from the trust fund administered by the PSC under N.D.C.C. § 60-04-03.1 because they are "noncredit-sale receiptholders" of the "insolvent warehouseman." The gist of Brotens' arguments is that, rather than considering the licensing and bonding requirements under N.D.C.C. ch. 60-02 for a public warehouseman's warehouse, these proceedings are governed solely by N.D.C.C. ch. 60-04, which alone controls the trust administration to settle the affairs of the insolvent warehouseman. Brotens argue the broad definitions of "public warehouseman" and "receipts" under N.D.C.C. § 60-04-01(5) and (6) support their argument that Brotens' grain sales are covered under N.D.C.C. § 60-04-03.1.

[¶ 15] Section 60-04-01(5), N.D.C.C., states that a " '[p]ublic warehouseman' means the person owning or operating a public warehouse which is located *or doing business* within this state, whether such owner or operator resides within this state or not." (Emphasis added.) *See also* N.D.C.C. § 60-02-01(6) (containing similar definition). Likewise, N.D.C.C. § 60-04-01(6) defines "[r]eceipts" as *"grain warehouse* receipts, scale tickets, checks, or other memoranda *given by a public warehouseman* for, or as evidence of, the receipt, storage, or sale of grain except when such memoranda was received as a result of a credit-sale contract." (Emphasis added.) *See also* N.D.C.C. § 60-02-01(7) (containing similar definition).

[¶ 16] Brotens contend under N.D.C.C. § 60-04-01(5) that the language, "or doing business within this state," in defining "public warehouseman" for purposes of chapter 60-04 is broad enough to encompass Brotens' transactions with Minnesota Grain's East Grand Forks facility. Further, Brotens contend the broad definition

of "receipt" does not require the receipt designate a warehouse licensed under North Dakota law. Brotens argue, based upon these definitions, that so long as Brotens are "receiptholders" from any Minnesota Grain warehouse facility, they are entitled to benefits regardless of whether the specific facility was located in this state or bonded under North Dakota law.

[¶ 17] We acknowledge the relevant terms under N.D.C.C. § 60-04-01 are broadly defined. Nonetheless, Brotens' broad interpretation of N.D.C.C. ch. 60-04 strains the clear intent of the entire statutory scheme by ignoring crucial elements of N.D.C.C. ch. 60-02, including the PSC's responsibility of supervising public warehouses in this state.

[¶ 18] Under N.D.C.C. § 60-02-02, the Legislature gave the PSC the duties imposed and powers conferred under N.D.C.C. ch. 60-02. Section 60-02-03(1), N.D.C.C., provides the PSC "shall have the duty and power to . . . [e]xercise general supervision *of the public warehouses of this state* . . . ." (Emphasis added.) The PSC is also charged with the duty and power to investigate complaints, examine and inspect any licensed warehouse, require the filing of reports regarding the operation of the warehouse and promulgate regulations "for carrying out and enforcing any law in this state regarding public warehouses." *See* N.D.C.C. § 60-02-03(2) to (5); *see also* N.D. Admin. Code art. 69-07.

[¶ 19] Under N.D.C.C. § 60-02-07, "[a]n annual license must be obtained from the [PSC] for each public warehouse in operation in this state." Additionally, the bonding requirements for a licensed public warehouseman under N.D.C.C. § 60-02-09 demonstrate the PSC's duties in supervising public warehouses within this state. Section 60-02-09, N.D.C.C., states in part:

"Before any license is issued to any public warehouseman under this chapter, the applicant for such license shall file a bond with the commission which shall:

. . . .

3. Run to the state of North Dakota for the benefit of all persons storing or *selling grain in such warehouse.*

. . . .

5. Specify *the location of each public warehouse* intended to be covered by such bond.

6. Be for the specific purpose of:

a. Protecting the holders of outstanding receipts.

b. Covering the costs incurred by the commission in the administration of chapter 60–04 in the event of the licensee's insolvency.

. . . ."

(Emphasis added.)

[¶ 20] Brotens concede that N.D.C.C. §§ 60–02–09(3) and 60–02–09(5) create "tension" with N.D.C.C. ch. 60–04, but yet encourage this Court to look only to ch. 60–04 for guidance. We must construe N.D.C.C. ch. 60–02 and ch. 60–04 together to determine who may properly be a claimant of the trust fund under N.D.C.C. § 60–04–03.1. "Statutes relating to the same subject matter shall be construed together and should be harmonized, if possible, to give meaningful effect to each, without rendering one or the other useless." *North Dakota Fair Housing Council, Inc. v. Peterson,* 2001 ND 81, ¶ 36, 625 N.W.2d 551 (quotations omitted).

[¶ 21] Section 60–02–03, N.D.C.C., defines the duties and powers of the PSC regarding the general supervision of public warehouses in this state. The statutory scheme does not provide for the PSC's regulation of public warehouses located outside this state. As a practical matter, it is also unclear how the PSC would promptly marshal assets, particularly grain, for a trust fund from public warehouses located in other states. By separating Brotens' transactions into "Minnesota transactions," the PSC recognized it could not marshal assets from Minnesota Grain's East Grand Forks warehouse for the benefit of receiptholders. The PSC also recognized that permitting payments outside of the state would unduly dilute the trust fund for other noncredit-sale receiptholders of the Rhame warehouse. In this case, there is more than merely delivery of grain out of state. The PSC determined the sales were actually to Minnesota Grain's East Grand Forks facility, because the Brotens' settlement statements designated "Minnesota Grain, Inc.—EGF Elevator" rather than the Rhame facility.

[¶ 22] Therefore, based upon our interpretation of N.D.C.C. ch. 60–02 and ch. 60–04, to be a "receiptholder" entitled to benefit from the trust fund under N.D.C.C. 60–04–03.1, the transactions with a public warehouseman must at least designate the warehouse for which the public warehouseman is licensed and bonded in this state. We reject Brotens' contention that the North Dakota trust fund and the North Dakota bond may benefit anyone who sold grain to Minnesota Grain, irrespective of the state in which the facility was located.

[¶ 23] The designated location of the warehouse is crucial, particularly where bond protection is determined by the warehouse for which a receipt is issued. In *North Dakota Pub. Serv. Comm'n v. Valley Farmers Bean Assoc.,* 365 N.W.2d 528, 547 (N.D.1985), this Court held that the PSC's interpretation that a surety was responsible for a warehouseman's obligations regardless of where it took possession of grain was reasonable and consistent. This Court in *Valley Farmers,*

focused on the warehouse designation on the scale tickets:

"The PSC has construed Chapter 60–02, N.D.C.C., to allow a warehouseman to accept grain at points other than the physical location of the warehouse, and upon acceptance the grain is protected by the bond coverage for the warehouse for which a scale ticket is issued. That construction is entitled to some weight where the agency interpretation does not contradict clear and unambiguous statutory language. *E.g., Application of Skjonsby Truck Line, Inc.,* 357 N.W.2d 227 (N.D.1984). We believe the PSC's interpretation is reasonable and consistent with the statutory scheme, and we conclude that a surety is responsible for the obligations of the warehouseman incurred through the operation of its warehouse regardless of where the physical acceptance and control of the grain took place. Therefore, persons who delivered beans to locations other than [Valley Farmers] bonded warehouses, but who received scale tickets with a warehouse designation of Portland or Buxton [where Valley Farmers operated elevators], have valid claims against the trust fund and the warehouseman's bonds."

*Valley Farmers,* 365 N.W.2d at 547.

[¶ 24] In this case, we agree with the PSC's argument that Minnesota Grain is not a "public warehouseman" in North Dakota for purposes of operation of the Minnesota facility. Although it is suggested that Minnesota Grain's grain purchasing activities at its East Grand Forks facility would be governed under the licensing and bonding provisions for grain buyers in N.D.C.C. ch. 60–02.1, we need not address that issue because there is no evidence Minnesota Grain was licensed as either a facility-based or roving grain buyer in North Dakota. *See* N.D.C.C. §§ 60–02.1–01(4), (6), (9) (defining types of grain buyers) and 60–02.1–07 (providing for grain buyer licensing). Furthermore, the actual language of the bond provided in this case under N.D.C.C. ch. 60–02 only covers the specific warehouse designated, which is plainly limited to the Rhame facility:

"The PRINCIPAL is the operator of a public warehouse(s) doing business in North Dakota. The warehouse(s) operated by the PRINCIPAL is(are) located as follows: #1 HIGHWAY 12, RHAME, ND 58651. The warehouse(s) described above is(are) to be operated pursuant to the law for receiving grain for buying, selling, storing, or shipping for compensation. The surety bond shall cover the warehouse(s) operated by the PRINCIPAL as a whole and not a specific amount for each."

The language of the bond covers the principal, Minnesota Grain, for obligations incurred as operator of the Rhame warehouse doing business in North Dakota. This language cannot be construed to cover Minnesota Grain's operation of the East Grand Forks facility.

[¶ 25] We therefore conclude the district court did not err in approving the PSC report and in denying Brotens' claims for grain sales to Minnesota Grain's East Grand Forks facility.

### III

[¶ 26] We have considered the remaining issues and arguments raised by the parties and find them to be either unnecessary to our decision or without merit. The district court order is affirmed.

[¶ 27] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, DALE V. SANDSTROM and CAROL RONNING KAPSNER, JJ., concur.

2008 ND 185

**In the Matter of R.A.S.**

**Cass County State's Attorney, Appellee**

v.

**R.A.S., Appellant.**

**No. 20080043.**

Supreme Court of North Dakota.

Oct. 22, 2008.

charge from commitment as a sexually dangerous individual. He argues the State did not prove by clear and convincing evidence that he is likely to engage in further acts of sexually predatory conduct and his substantive due process rights were violated. We conclude the district court did not make sufficient findings of fact, and we reverse and remand for further findings.

I

[¶2] In 2004, R.A.S. was committed to the care, custody, and control of the executive director of the Department of Human Services as a sexually dangerous individual under N.D.C.C. ch. 25–03.3.

[¶3] In October 2007, R.A.S. petitioned for discharge under N.D.C.C. § 25–03.3–18. At a January 2008 discharge hearing, the State and R.A.S. both presented expert testimony. The State's expert witness, Dr. Lynne Sullivan, testified R.A.S. remains a sexually dangerous individual and recommended he remain committed. R.A.S.'s expert witness, Dr. James H. Gilbertson, testified R.A.S. was not likely to engage in further acts of sexually predatory conduct. The district court denied R.A.S.'s petition for discharge, finding "[t]he State has shown by clear and convincing evidence that [R.A.S.] remains a sexually dangerous individual as defined in N.D.C.C. § 25–03.3–01."

II

[¶4] R.A.S. argues the State did not prove by clear and convincing evidence that he remains a sexually dangerous individual, because Dr. Gilbertson testified R.A.S. was not likely to engage in further acts of sexually predatory conduct.

[¶5] This Court reviews civil commitments of sexually dangerous individuals under a modified clearly erroneous standard, and we will affirm the district court's

Birch Peterson Burdick, State's Attorney, Fargo, N.D., for appellee.

Richard Edward Edinger, Fargo, N.D., for appellant.

MARING, Justice.

[¶1] R.A.S. appeals from a district court order denying his petition for dis-

decision unless the court's order is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence. *In the Matter of E.W.F.*, 2008 ND 130, ¶ 8, 751 N.W.2d 686.

■ [¶ 6] At a discharge hearing, the burden is on the State to prove by clear and convincing evidence that the committed individual remains a sexually dangerous individual. N.D.C.C. § 25–03.3–18(4). To meet this burden, the State must show the committed individual has:

> ■ engaged in sexually predatory conduct and ... [2] has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that [3] makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.

N.D.C.C. § 25–03.3–01(8). In addition to the three requirements of the statute, there must also be proof the committed individual has serious difficulty controlling his behavior to satisfy substantive due process requirements. *E.W.F.*, 2008 ND 130, ¶ 10, 751 N.W.2d 686 (citing *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002)).

[¶ 7] Here, the district court found, "[t]he State has shown by clear and convincing evidence that [R.A.S.] remains a sexually dangerous individual as defined in N.D.C.C. § 25–03.3–01." The court did not make any further findings supporting its decision in its order denying discharge or orally during the discharge hearing.

■ [¶ 8] In civil actions tried without a jury or with an advisory jury, N.D.R.Civ.P. 52(a) requires the court to:

> find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. . . . It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.

"Conclusory, general findings do not comply with N.D.R.Civ.P. 52(a), and a finding of fact that merely states a party has failed in [or has sustained] its burden of proof is inadequate under the rule." *Rothberg v. Rothberg*, 2006 ND 65, ¶ 14, 711 N.W.2d 219. The court must specifically state the facts upon which its ultimate conclusion is based on. *Id.* The purpose of the rule is to "provide the appellate court with an understanding of the factual issues and the basis of the district court's decision." *Clark v. Clark*, 2005 ND 176, ¶ 8, 704 N.W.2d 847. Because this Court defers to a district court's choice between two permissible views of the evidence and the district court decides issues of credibility, *see Stanhope v. Phillips–Stanhope*, 2008 ND 61, ¶ 10, 747 N.W.2d 79, detailed findings are particularly important when there is conflicting or disputed evidence. This Court cannot review a district court's decision when the court does not provide any indication of the evidentiary and theoretical basis for its decision because we are left to speculate what evidence was considered and whether the law was properly applied. *See Clark*, at ¶¶ 9 and 13. The court errs as a matter of law when it does not make the required findings. *L.C.V. v. D.E.G.*, 2005 ND 180, ¶ 11, 705 N.W.2d 257.

■ [¶ 9] In order to review the district court's decision and determine whether its findings are clearly erroneous, we must understand the basis for the court's decision, and in this case we cannot. Rather, the district court's finding is general and conclusory, and merely states that

the State sustained its burden of proof. *Cf. Federal Land Bank of St. Paul v. Lillehaugen,* 404 N.W.2d 452, 459 (N.D. 1987) (general, conclusory finding on confiscatory-price defense not sufficient). Detailed findings, including credibility determinations and references to evidence the court relied on in making its decision, inform the committed individual and this Court of the evidentiary basis for the court's decision. *See In the Interest of J.S.,* 2001 ND 10, ¶ 9, 621 N.W.2d 582. Here, the court's findings do not provide us with an understanding of the factual basis for the court's ultimate finding that R.A.S. remains a sexually dangerous individual. The court was required to make detailed findings of fact to support its ultimate finding that R.A.S. remains a sexually dangerous individual; including detailed findings about whether R.A.S. has engaged in sexually predatory conduct, whether he has a sexual, personality, or mental disorder that makes him likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others, and whether he has serious difficulty controlling his behavior. N.D.C.C. § 25–03.3–01(8); *E.W.F.,* 2008 ND 130, ¶ 10, 751 N.W.2d 686. We conclude the district court did not comply with N.D.R.Civ.P. 52(a) and therefore its findings are inadequate to permit appellate review.

[¶ 10] We reverse the district court's order and remand for detailed findings of fact and conclusions of law to support the court's decision to deny R.A.S.'s petition for discharge.

### III

## IV

[¶ 14] We conclude the district court did not make sufficient findings of fact, and we reverse and remand.

[¶ 15] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, DANIEL J. CROTHERS, and CAROL RONNING KAPSNER, JJ., concur.