2017 ND 201

**PUBLIC SERVICE COMMISSION,**
Petitioner, Appellee, and
Cross-Appellant

v.

**GRAND FORKS BEAN COMPANY, INC., Respondent**

and

**Auto-Owners Insurance Company,**
Respondent, Appellee, and
Cross-Appellant

and

**Bremer Bank, National Association,**
Interested Party, Appellant,
and Cross-Appellee

and

**Curt Amundson, Interested Party, Appellee, and Cross-Appellant**

and

**Brent Baldwin, Baldwin Farms, Inc., Duane Altendorf, Ronald Adams, Nicholas Adams, Chuck Nelson, and**

WJS Nelson, Interested Parties and Appellees

No. 20160303

Supreme Court of North Dakota.

Filed 8/9/2017

Mitchell D. Armstrong (argued), Illona A. Jeffcoat-Sacco (on brief), and Brian Schmidt (on brief), Special Assistant Attorneys General, Bismarck, N.D., for petitioner, appellee, and cross-appellant Public Service Commission.

Michael J. Morley, Grand Forks, N.D., for respondent, appellee, and cross-appellant Auto-Owners Insurance Company.

Tracy A. Kennedy (argued) and John D. Schroeder (on brief), Grand Forks, N.D., for interested party, appellant, and cross-appellee Bremer Bank, National Association.

Jon R. Brakke, Fargo, N.D., for interested party, appellee, and cross-appellant Curt Amundson.

Daniel L. Gaustad (argued) and Joseph E. Quinn (on brief), Grand Forks, N.D., for interested parties and appellees Brent Baldwin, Baldwin Farms, Inc., and Duane Altendorf.

Russell J. Melland, Grand Forks, N.D., for interested parties and appellees Ronald Adams, Nicholas Adams, Chuck Nelson, and WJS Nelson.

Tufte, Justice.

[¶1] Bremer Bank, the Public Service Commission ("PSC"), Auto-Owners Insurance Company, and Curt Amundson appeal from a judgment in a grain warehouse insolvency proceeding involving Grand Forks Bean Company after the district court appointed the PSC as trustee for the sale of dry edible beans from Grand Forks Bean's warehouse, denied Bremer's motion to intervene in the insolvency proceeding, and ordered distribution of the proceeds of the sale of the beans to growers determined to be noncredit-sale receiptholders. We conclude the district court did not err in construing applicable statutory provisions for insolvency proceedings and in applying those provisions. We affirm.

I

[¶2] During the time period relevant to this proceeding, the PSC licensed Grand Forks Bean as a public grain warehouse under N.D.C.C. ch. 60-02, and Auto-Owners provided Grand Forks Bean with a $100,000 surety bond under N.D.C.C. § 60-02-09. Bremer loaned money to Grand Forks Bean, and Grand Forks Bean executed a security agreement granting Bremer a security interest in Grand Forks Bean's personal property, including its inventory.

[¶3] In November and December 2014, the PSC received complaints from nine dry edible bean growers about difficulty in obtaining payment or marketing services for beans delivered to Grand Forks Bean's warehouse. The nine bean growers were Amundson, Beth Nelson as assignee of the estate of Brad Nelson, Duane Altendorf, Brent Baldwin, Baldwin Farms, Inc., Ronald Adams, Nicholas Adams, Chuck Nelson, and WSJ Nelson. After determining the complaints could not be resolved without an insolvency proceeding, the PSC issued a cease and desist order against Grand Forks Bean. The beans in Grand Forks Bean's warehouse were ultimately sold, and the proceeds were deposited in an interest-bearing trust fund account under N.D.C.C. § 60-04-08.

[¶4] In February 2015, the PSC applied for appointment as the trustee of the trust fund assets from the sale of the beans, alleging Grand Forks Bean was insolvent under N.D.C.C. ch. 60-04 and seeking an order preserving trust assets. The district court appointed the PSC as trustee of the trust fund. According to Susan Richter, the licensing director at the PSC, as of February 29, 2016, the trust fund had a balance of $768,053.24 from the sale of the beans.

[¶5] Bremer and the nine growers filed claims against the trust fund proceeds and Auto-Owners' surety bond. Bremer alleged it was a secured creditor of Grand Forks Bean and the proceeds from the sale of Grand Forks Bean's bean inventory were subject to Bremer's security agreement and superior lien in the principal amount of $641,471.06, plus interest. Bremer alternatively alleged it was entitled to distribution from the trust fund assets after distribution to any valid noncredit-sale receiptholders and the PSC was not entitled to a distribution from trust fund assets for any incurred ex-

penses. The nine bean growers ultimately filed amended claims alleging they were noncredit-sale receiptholders of Grand Forks Bean, Grand Forks Bean's date of insolvency was no later than October 15, 2013, and the price per hundredweight of beans on the date of insolvency was $38.

[¶6] Bremer moved to intervene as a respondent in the insolvency proceeding under N.D.R.Civ.P. 24 and to file an answer, a counterclaim against the PSC, and a cross-claim against Grand Forks Bean. Bremer asserted its perfected security interest in Grand Forks Bean's beans had priority over the other claimants' interest in the beans and the disposition of the insolvency proceeding would impair or impede its ability to protect its interest. Bremer sought a declaratory judgment on the superiority of its lien and foreclosure of its interest in Grand Forks Bean's assets.

[¶7] The district court denied without prejudice Bremer's motion to intervene, but allowed Bremer to participate in the insolvency proceeding "to the full extent provided to any other receiptholder/claimant." The court explained that resolution of the issue of whether Bremer's formal intervention was required was not necessary because the PSC, Auto-Owners, and all the other claimants agreed Bremer could participate in the proceeding as a claimant and assert objections to any proposed distribution. The court said intervention would be granted if there were any objection to Bremer's participation, but any intervention would be limited to claims within the scope of an insolvency proceeding under N.D.C.C. ch. 60-04.

[¶8] The PSC initially issued a trustee's report concluding all nine bean growers were noncredit-sale receiptholders entitled to participate in the trust fund proceeds and recommending payment of $652,747.92 to those receiptholders based on a Decem-ber 2014 insolvency date and a market price of $23 per hundredweight on that date.

[¶9] After an evidentiary hearing, the district court modified the PSC's report and ordered payment of $770,190 in claims plus interest from the trust fund proceeds and payment of the PSC's costs and expenses. The court ruled eight of the bean growers were noncredit-sale receiptholders entitled to participate in the insolvency trust fund proceeds. The court concluded one grower, Amundson, had a credit-sale contract with Grand Forks Bean under N.D.C.C. § 60-04-01(2) and was not entitled to participate in the trust fund proceeds. The court also determined the date of Grand Forks Bean's insolvency under N.D.C.C. § 60-04-02 was October 15, 2013, and the market price for beans on that date was $38 per hundredweight. The court determined three growers were entitled to a different price per hundredweight for their beans because they had cash claims with Grand Forks Bean for an agreed price. The court further concluded the PSC was entitled to its costs and expenses under N.D.C.C. §§ 60-04-03.1, 60-04-09, and 60-04-10. The court ordered disbursement of the trust fund proceeds and thereafter issued an order denying Auto-Owner's motion for post-hearing relief. Bremer, the PSC, Auto-Owners, and Amundson appeal.

II

[¶10] The issues raised in this appeal primarily involve the interpretation and application of statutory provisions for grain and seed warehouses and insolvent grain warehousemen. Statutory interpretation is a question of law, fully reviewable on appeal. *Pub. Serv. Comm'n v. Minnesota Grain, Inc.*, 2008 ND 184, ¶ 9, 756 N.W.2d 763. The primary objective in interpreting statutes is to determine legisla-

tive intent, as that intent is expressed in the language of the statute. *Pub. Serv. Comm'n v. Wimbledon Grain Co.*, 2003 ND 104, ¶ 20, 663 N.W.2d 186. Statutory provisions and all proceedings under those provisions "are to be construed liberally, with a view to effecting its objects and to promoting justice." N.D.C.C. § 1-02-01. Statutory provisions are given their plain, ordinary, and commonly understood meaning, unless they are specifically defined or a contrary intention plainly appears. N.D.C.C. § 1-02-02. Words and phrases are construed according to the context in which they are used, and technical words defined by statute must be construed according to that definition. N.D.C.C. § 1-02-03. Statutes are construed as a whole and harmonized to give meaning to related provisions. N.D.C.C. § 1-02-07. Statutes are construed to give effect to all of their provisions so no part of a statute is rendered inoperative or superfluous. N.D.C.C. § 1-02-38(2) and (4). "When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." N.D.C.C. § 1-02-05.

[¶11] A district court's findings of fact in a warehouse insolvency proceeding are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a). *See N.D. Pub. Serv. Comm'n v. Cent. States Grain, Inc.*, 371 N.W.2d 767, 777 (N.D. 1985); *State ex rel. Pub. Serv. Comm'n v. R. F. Gunkelman & Sons, Inc.*, 219 N.W.2d 853, 858-59 (N.D. 1974). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing the entire record, we are left with a definite and firm conviction a mistake has been made. *Matter of Estate of Johnson*, 2017 ND 162, ¶ 9, 897 N.W.2d 921. In reviewing findings of fact, we do not reweigh the evidence, and we "give due re-

gard to the trial court's opportunity to judge the witnesses' credibility." N.D.R.Civ.P. 52(a)(6). Under N.D.R.Civ.P. 52(a), a choice between two permissible views of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the district court's findings. *Knudson v. Kyllo*, 2012 ND 155, ¶ 9, 819 N.W.2d 511.

### III

[¶12] Bremer argues it was entitled to intervene in the insolvency proceeding as a matter of right and as a matter of permissive intervention under N.D.R.Civ.P. 24. Bremer claims the district court's decision impeded its ability to litigate the priority of its security interest in Grand Forks Bean's inventory because the decision precluded consideration of statutes outside N.D.C.C. ch. 60-04 in determining the priority of Bremer's interest. The PSC responds that the district court did not err in denying Bremer's motion to intervene, and even if the court erred, any error was harmless because the court allowed Bremer to assert all arguments and participate fully in the insolvency proceeding to determine whether the growers were protected noncredit-sale receiptholders or had credit-sale contracts with Grand Forks Bean.

[¶13] Rule 24, N.D.R.Civ.P., allows for intervention as a matter of right and for permissive intervention. *White v. T.P. Motel, L.L.C.*, 2015 ND 118, ¶ 19, 863 N.W.2d 915; *Skogen v. Hemen Twp. Bd. of Twp. Supervisors*, 2010 ND 92, ¶ 7, 782 N.W.2d 638. We construe N.D.R.Civ.P. 24 liberally, and intervention historically has been liberally granted in North Dakota. *White*, at ¶ 22; *Eichhorn v. Waldo Twp. Bd. of Supervisors*, 2006 ND 214, ¶ 13, 723 N.W.2d 112; *Skogen*, at ¶ 7; *Braatelien v.*

*Burns*, 74 N.D. 29, 32, 19 N.W.2d 827, 828 (1945).

[¶14] In *White*, 2015 ND 118, ¶ 20, 863 N.W.2d 915, we said N.D.R.Civ.P. 24 is derived from and is substantially similar to Fed.R.Civ.P. 24, and when a state rule is derived from a corresponding federal rule, the federal courts' interpretation of the federal rule may be persuasive authority when interpreting our rule. We said that "[u]nder Fed.R.Civ.P. 24(a)(2), upon a timely motion, a person is entitled to intervene as of right if: (1) the person has a cognizable interest in the subject matter of the litigation; (2) the interest may be impaired as a result of the litigation; and (3) the interest is not adequately represented by an existing party to the litigation." *White*, at ¶ 21 (citing *Chiglo v. City of Preston*, 104 F.3d 185, 187 (8th Cir. 1997); *Kansas Pub. Emp. Ret. Sys. v. Reimer & Koger Assoc., Inc.*, 60 F.3d 1304, 1307 (8th Cir. 1995)).

[¶15] The ultimate question of whether a party may intervene as a matter of right under N.D.R.Civ.P. 24(a) is a question of law that is fully reviewable on appeal. *White*, 2015 ND 118, ¶ 23, 863 N.W.2d 915; *Fisher v. Fisher*, 546 N.W.2d 354, 355 (N.D. 1996); *Skogen*, 2010 ND 92, ¶ 7, 782 N.W.2d 638. In considering a party's motion to intervene under N.D.R.Civ.P. 24(a), we review any findings of fact made by the district court under the clearly erroneous standard of review in N.D.R.Civ.P. 52(a). *White*, at ¶ 23; *Skogen*, at ¶ 7.

[¶16] A district court's decision on permissive intervention will not be reversed on appeal absent an abuse of discretion. *White*, 2015 ND 118, ¶ 23, 863 N.W.2d 915; *Fisher*, 546 N.W.2d at 356. A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a rea-

soned determination, or it misinterprets or misapplies the law. *City of Bismarck v. Mariner Constr., Inc.*, 2006 ND 108, ¶ 8, 714 N.W.2d 484.

[¶17] The district court denied without prejudice Bremer's motion to intervene in this insolvency proceeding to litigate the priority of its security interest, but allowed Bremer to participate in the proceeding "to the full extent provided to any other receiptholder/claimant." The court explained:

> [R]esolution of the issue of whether or not formal intervention is required is not necessary. The PSC, the surety and all of the other claimants agree that Bremer may proceed in this action as a claimant and assert objections to any of the proposed distributions. Under these circumstances intervention is unnecessary. In the event that an objection to Bremer's participation in these proceedings were to be asserted, intervention would be granted, but limited to proceedings within the scope of Chapter 60-04 (limited to objections to the commissioner's report and proposed distributions).

[¶18] In *N.D. Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n*, 365 N.W.2d 528, 537-40 (N.D. 1985), this Court considered a claim by three Banks as a secured creditor in the context of a grain warehouse insolvency proceeding under N.D.C.C. ch. 60-04. The Banks had a security interest in the warehouseman's inventory, and as the Banks disbursed loan funds to the warehouseman on a line of credit, the warehouseman prepared and delivered to the Banks documents identified as "warehouse receipts." *Id.* at 537. This Court said the purpose of a warehouse insolvency proceeding was to create a trust fund for the receiptholders of the warehouseman and held labeling the documents issued to the Banks as "warehouse

receipts" did not change the Banks' status from a secured creditor to a "receiptholder." *Id.* at 537-38. This Court held the Banks were not entitled to participate in trust fund assets on the basis of the warehouse receipts. *Id.* In addressing the Banks' claim that they were entitled to participate in the trust fund assets on the basis of their security interest, this Court rejected the Banks' claim and concluded valid receiptholders had priority over the Banks' secured claim to the warehouseman's inventory under the applicable statutory insolvency provisions. *Id.* at 539-40.

[¶19] The relevant statutory framework has not changed since *Valley Farmers.* Under N.D.C.C. § 60-02-25, the delivery of grain to a public warehouse for an unconverted scale ticket or warehouse receipt is a bailment, and the grain is not subject to seizure by court process in an action against the bailee. Under N.D.C.C. § 60-02-25.1, the grain in a warehouse is subject to a first priority lien in favor of outstanding receiptholders, and the lien shall be preferred to any lien or security interest in favor of any warehouseman creditor regardless of when the creditor's lien attached to the grain. Section 60-04-03.1, N.D.C.C., provides that upon the insolvency of any warehouseman, a trust fund is established for the benefit of noncredit-sale receiptholders and for costs incurred by the PSC in the administration of N.D.C.C. ch. 60-04. Under those provisions, a secured creditor's claim to a warehouseman's grain is not superior to claims by noncredit-sale receiptholders or by the PSC for costs and expenses for administration of trust fund proceeds. Nevertheless, a secured creditor's interest in a warehouseman's grain may be intertwined with a noncredit-sale receiptholder's claim to the same grain in an insolvency proceeding under N.D.C.C. ch. 60-04, in which case intervention by a secured creditor is appropriate either as a matter of right or

as a matter of discretion to efficiently consider all conflicting interests. Because the district court expressly denied Bremer's motion to intervene in this insolvency proceeding, we conclude the court abused its discretion.

[¶20] Although the court denied Bremer's motion to intervene in the insolvency proceeding without prejudice, the court allowed Bremer to participate in the proceeding to the full extent provided to other receiptholders and claimants. Within the statutory framework for warehousemen insolvency proceedings, this record does not reflect that Bremer was precluded from establishing and protecting its security interest in the context of the competing claims by the bean growers as either noncredit-sale receiptholders or entities with credit-sale contracts. Rather, Bremer was allowed to fully participate in this insolvency proceeding to adequately litigate and protect its interest in the trust fund proceeds against the growers' competing claims and the PSC's claim for costs and expenses. We conclude Bremer was not precluded from protecting its interests in the insolvency proceeding and the error in denying Bremer's motion to intervene was harmless.

## IV

[¶21] We next consider the district court's determinations about the growers' status either as entities with credit-sale contracts, which would not entitle them to participate in the insolvency trust fund, or as noncredit-sale receiptholders, which would entitle them to participate in the trust fund.

[¶22] The district court concluded the definition of credit-sale contract in N.D.C.C. § 60-04-01(2) controlled the growers' status and incorporated only the notice requirement of N.D.C.C. § 60-02-

19.1(7) for a valid credit-sale contract. The court also explained transactions involving credit-sale contracts were governed by Uniform Commercial Code provisions relating to the sale of goods, including the requirement that an enforceable contract for the sale of goods must be in writing and signed by the party against whom enforcement is sought under N.D.C.C. § 41-02-08 (U.C.C. § 2-201). The court thereafter analyzed the transactions involving each grower and concluded that Amundson had a credit-sale contract with Grand Forks Bean and was not entitled to participate in the trust fund proceeds but that the other growers were noncredit-sale receiptholders and were entitled to participate in the trust fund proceeds.

[¶23] Bremer argues the district court erred as a matter of law in ruling a credit-sale contract requires a signature and in deciding eight of the growers were non-credit-sale receiptholders entitled to participate in the trust fund proceeds. Bremer claims that all the growers had credit-sale contracts with Grand Forks Bean under the definition of a credit-sale contract in N.D.C.C. § 60-04-01(2) and that none of the growers were noncredit-sale receiptholders.

[¶24] The PSC argues all the growers were noncredit-sale receiptholders because the definition of credit-sale contract in N.D.C.C. § 60-04-01(2) incorporates all the provisions of N.D.C.C. § 60-02-19.1 and there was no evidence the relevant documents were signed by both required parties under N.D.C.C. § 60-02-19.1. The PSC alternatively claims that if the district court correctly concluded only N.D.C.C. § 60-02-19.1(7) is incorporated into the definition of a credit-sale contract in N.D.C.C. § 60-04-01(2), the court correctly decided the status of the growers.

[¶25] Amundson argues the district court erred in concluding he had a credit-sale contract with Grand Forks Bean because the definition of a credit-sale contract in N.D.C.C. § 60-02-19.1 controls and requires signatures by both the grower and the warehouseman to be a credit-sale contract.

[¶26] The other eight growers argue the district court correctly decided they did not have credit-sale contracts with Grand Forks Bean because credit-sale contracts are written contracts that must be signed by the party to be charged and the court correctly decided that they, or their authorized agents, did not sign applicable price later marketing agreements, or that applicable dry bean contracts did not have the notice language required by N.D.C.C. § 60-02-19.1(7). The eight growers thus claim the court correctly decided they were noncredit-sale receiptholders entitled to participate in the trust fund proceeds.

[¶27] The district court's decision provided a detailed interpretation of N.D.C.C. §§ 60-02-19.1 and 60-04-01(2) and application of those provisions to the separate growers. Section 60-04-01, N.D.C.C., defines terms in N.D.C.C. ch. 60-04, which deals with insolvent grain warehousemen, and provides:

In this chapter, unless the context or subject matter otherwise requires:

. . . .

2. "Credit-sale contract" means a written contract for the sale of grain pursuant to which the sale price is to be paid or may be paid more than thirty days after the delivery or release of the grain for sale and which contains the notice provided in subsection 7 of section 60-02-19.1. When a part of the sale price of a contract for the sale of grain is to be paid or may be paid more than thirty days after the delivery or release of the grain for sale, only such part of the contract is a credit-sale contract.

Section 60-02-19.1, N.D.C.C., describes credit-sale contracts in a chapter generally dealing with grain and seed warehouses and provides, in relevant part:

A warehouseman shall not purchase grain by a credit-sale contract except as provided in this section. All credit-sale contracts must be in writing and must be consecutively numbered at the time of printing the contract. The warehouseman shall maintain an accurate record of all credit-sale contract numbers, including the disposition of each numbered form, whether by execution, destruction, or otherwise. Each credit-sale contract must contain or provide for all of the following:

1. The seller's name and address.

2. The conditions of delivery.

3. The amount and kind of grain delivered.

4. The price per unit or basis of value.

5. The date payment is to be made.

6. The duration of the credit-sale contract.

7. Notice in a clear and prominent manner that the sale is not protected by the bond coverage provided for in section 60-02-09. However, if the warehouseman has obtained bond coverage in addition to that required by section 60-02-09 and such coverage extends to the benefit of credit-sale contracts, the warehouseman may state the same in the credit-sale contract along with the extent of such coverage.

The contract must be signed by both parties and executed in duplicate. One copy shall be retained by the warehouseman and one copy shall be delivered to the seller.

[¶28] We have recognized N.D.C.C. ch. 60-04 "addresses insolvent grain warehousemen and provides 'an insolvency procedure designed to provide a prompt method for receipt holders to recover their claims.'" *Minnesota Grain*, 2008 ND 184, ¶ 11, 756 N.W.2d 763 (quoting *N.D. Pub. Serv. Comm'n v. Jamestown Farmers Elevator, Inc.*, 422 N.W.2d 405, 407 (N.D. 1988)). In *Minnesota Grain*, at ¶ 10 (quoting *Wimbledon Grain*, 2003 ND 104, ¶ 21, 663 N.W.2d 186), we also said, "The law relating to grain insolvencies was intended for the benefit of claimants, and must be construed with sufficient liberality to effectuate its purpose of settling the legitimate demands of owners of grain delivered to an insolvent elevator without doing injury to those who are liable." *See* N.D.C.C. § 1-02-01 (statutory provisions construed liberally with view to effecting its objects and to promoting justice).

[¶29] The plain language of the definition of a credit-sale contract in N.D.C.C. § 60-04-01(2) is part of the statutory framework for insolvency proceedings and explicitly requires a written contract containing the notice required by N.D.C.C. § 60-02-19.1(7). *See also* N.D.C.C. § 60-02-01(2) (4) and (7) (defining credit-sale contract in similar language and defining "noncredit-sale contract" as a contract for the sale of grain other than a credit-sale contract and "receipts" as certain memoranda given by a public warehouseman as evidence of the receipt, storage, or sale of grain except when the memoranda was received as the result of a credit-sale contract). The reference in N.D.C.C. § 60-04-01(2) to only one specific subsection of N.D.C.C. § 60-02-19.1 evidences an intent to include only that subsection in the definition of a credit-sale contract for purposes of the priorities in an insolvency proceeding. Moreover, when considered as a whole with N.D.C.C. ch. 60-02, the plain language of N.D.C.C. § 60-02-19.1 is a prohibition against a warehouseman purchasing grain by a credit-sale contract except as provid-

ed in that section and not a definition of a credit-sale contract that would replace the definition for an insolvency proceeding in N.D.C.C. § 60-04-01(2). We conclude the district court correctly interpreted the plain language of the relevant statutory provisions and concluded a credit-sale contract for purposes of an insolvency proceeding is defined in N.D.C.C. § 60-04-01(2) to be a written contract for the sale of grain incorporating only the notice provision of N.D.C.C. § 60-02-19.1(7).

[¶30] In applying the statutes, the district court said a credit-sale contract for the sale of grain involves the sale of goods and must be in writing and signed by the party against whom enforcement is sought under the Uniform Commercial Code. *See* N.D.C.C. § 41-02-05 (U.C.C. § 2-105) (defining goods as all things movable at time of identification to contract for sale, including growing crops); N.D.C.C. § 41-02-08 (U.C.C. § 2-201) (providing statute of frauds for sale of goods). The court analyzed the applicable dry bean contracts and price later marketing agreements for each grower. The court decided the applicable dry bean contracts were not credit-sale contracts because they did not include the notice requirement of N.D.C.C. § 60-02-19.1(7). The court also determined the growers, except Amundson, did not sign or authorize signatures of the relevant price later marketing agreements or those agreements did not represent a transaction between merchants confirmed in writing without objection under N.D.C.C. § 41-02-08 (U.C.C. § 2-201). The court thus determined eight growers were noncredit-sale receiptholders entitled to participate in the insolvency trust fund proceeds. The court also determined Amundson signed a written price later marketing agreement that satisfied the signature requirement for a credit-sale contract and he was not entitled to partic-

ipate in the insolvency trust fund proceeds.

[¶31] We conclude the district court correctly construed the statutory requirements for a credit-sale contract and applied that interpretation to each grower's relationship with Grand Forks Bean. Evidence in this record supports the district court's classification of the growers as either noncredit-sale receiptholders entitled to participate in the trust fund proceeds or as credit-sale contractors not entitled to participate in the trust fund proceeds. We are not left with a definite and firm conviction the court made a mistake in applying the statutory provisions to the circumstances in this case. We conclude the court did not misapply the law or clearly err in classifying the eight growers as noncredit-sale receiptholders and in classifying Amundson as a credit-sale contractor.

V

[¶32] The parties also raise arguments about the district court's determination of Grand Forks Bean's insolvency date, which generally establishes the price per hundredweight payable to noncredit-sale receiptholders.

[¶33] The district court decided that under the language of N.D.C.C. § 60-04-02, noncredit-sale receiptholder Altendorf's demand for payment for his beans in October 2013 established the date of Grand Forks Bean's insolvency as October 15, 2013. Using that date, the court decided the price per hundredweight for the beans was $38. The PSC's trustee report recommended the date of Grand Forks Bean's insolvency as December 19, 2014, with a price per hundredweight on that date of $23.

[¶34] Bremer, the PSC, and Auto-Owners argue the correct date for insolvency was December 2014, when the price of beans was $23 per hundredweight. Auto-

Owners, the surety for Grand Forks Bean, also argues the court should have applied N.D.C.C. § 60-02-41 rather than N.D.C.C. § 60-04-02 to determine the date of insolvency. The parties do not dispute the price per hundredweight for beans was $38 in October 2013 and $23 in December 2014, and their arguments involve the appropriate date for determining Grand Forks Bean's insolvency, which initially involves consideration of N.D.C.C. §§ 60-02-41 and 60-04-02.

[¶35] Section 60-02-41, N.D.C.C., provides:

When a public warehouseman ceases business through the destruction of a warehouse by fire or other cause, or through insolvency, such warehouseman shall redeem all outstanding unconverted scale tickets or warehouse receipts at the price prevailing on the date the warehouse was destroyed or closed because of insolvency. The holder of such receipts, upon due notice, must accept this price and surrender the receipts. Any public warehouseman who voluntarily ceases business or fails to renew an existing warehouse license or whose warehouse license is revoked shall notify the commission and all outstanding receiptholders of such closing and redeem all outstanding unconverted scale tickets or warehouse receipts at the price prevailing on the date the warehouse closed or at the option of the owner of the receipt redeliver the kind, grade, and quantity of grain called for by the un-

converted scale ticket or warehouse receipt. On commingled grain the value of over and under deliveries in quantity, grade, and protein shall be settled in cash and priced on the market on the day of closing.

[¶36] At the time relevant to this insolvency proceeding, N.D.C.C. § 60-04-02 provided:[1]

A licensee is insolvent when the licensee refuses, neglects, or is unable upon proper demand to make payment for grain purchased or marketed by the licensee or to make redelivery or payment for grain stored.

[¶37] This Court has said N.D.C.C. § 60-04-02 "establishes when a warehouseman is considered insolvent." *Minnesota Grain*, 2008 ND 184, ¶ 11, 756 N.W.2d 763. The plain language of N.D.C.C. § 60-04-02 uses the word "when" to describe the insolvency of a warehouseman and says a licensee is insolvent when certain circumstances occur. Although N.D.C.C. § 60-02-41 describes the price for outstanding unconverted scale tickets or warehouse receipts "at the price prevailing on the date the warehouse was ... closed because of insolvency," that statute does not explain when the warehouse is considered insolvent. We also recognize another provision in N.D.C.C. ch. 60-04 deals with distribution of the trust fund proceeds for receiptholders in insolvency proceedings and uses the phrase "market price prevailing on the date of the insolvency." N.D.C.C. § 60-04-09(5).[2] We conclude the plain language of

1. Section 60-04-02, N.D.C.C., was amended effective August 1, 2017, by 2017 N.D. Sess. Laws ch. 417, § 13, to provide:

    A licensee is insolvent when the licensee refuses, neglects, or is unable upon proper written demand, including electronic communication, to make payment for grain purchased or marketed by the licensee or to make redelivery or payment for grain stored.

2. Section 60-04-09, N.D.C.C., was also amended effective August 1, 2017, by 2017 N.D. Sess. Laws ch. 417, § 16, to provide, in relevant part:

    4. In case of cash claims or checks, the amount thereof.

    5. In the case of scale tickets or warehouse receipts, the amount thereof based upon the market price prevailing on the date the commission first received a copy of

N.D.C.C. § 60-04-02 evidences legislative intent for "when" an insolvency occurs and the district court did not err in applying N.D.C.C. § 60-04-02 to determine the date when Grand Forks Bean could be considered insolvent.

[¶38] We also agree with the district court's conclusion that the plain language in the two clauses of N.D.C.C. § 60-04-02 identify two circumstances for considering a licensee insolvent: (1) when the licensee has purchased or marketed grain; or (2) when the licensee has stored grained. *See State ex rel. Stenehjem v. FreeEats.com, Inc.*, 2006 ND 84, ¶ 14, 712 N.W.2d 828 (stating use of the word "or" is disjunctive and indicates alternative between different things or actions). Under the plain language of N.D.C.C. § 60-04-02, a licensee is insolvent when the licensee refuses, neglects, or is unable upon proper demand either: (1) to make payment for grain purchased or marketed by the licensee; or (2) to make redelivery or payment for grain stored. We also agree with the district court's interpretation of the term "marketed" in the first clause of N.D.C.C. § 60-04-02:

The most reasonable interpretation of the term "marketed" in the first clause is that it requires the beans to have been sold to a third party. The intent of the first clause is to require the warehouseman to tender payment if the warehouseman purchased the beans for them self or when the beans had been sold to a third party. To interpret "marketed" as including prospective or current marketing would allow a grower to deliver beans for marketing and, before the beans are sold ("marketed"), demand payment and trigger "insolvency"; that result is not reasonable.

the written demand required by section

[¶39] The district court thereafter analyzed each of the nine growers' relationship with Grand Forks Bean against the language of N.D.C.C. § 60-04-02 and concluded Altendorf's actions in October 2013 were under the first clause of N.D.C.C. § 60-04-02 and established October 15, 2013, as the date of Grand Forks Bean's insolvency. The court explained:

Duane Altendorf had a noncredit-sale relationship because there was not a written agreement as required by § 60-04-01(2). Duane Altendorf testified that his agreement with Grand Forks Bean resulted from a phone call with Grand Forks Bean. Grand Forks Bean promised payment of $45 per cwt. Duane Altendorf expected immediate payment and delivered beans on September 23 and September 24, 2013. Duane Altendorf demanded payment in October of 2013 without success. A partial payment for 2,000 cwt. at $45 per cwt. was issued on December 31, 2013. Duane Altendorf's testimony is credible and a reasonable conclusion is that he sold beans for immediate payment, demanded full payment in October of 2013, was refused payment, and subsequently received partial payment in December of 2013.

Because the agreement Duane Altendorf had with Grand Forks Bean was a purchase by Grand Forks Bean the first clause for determining insolvency applies. Pursuant to the first clause insolvency is measured from the first unfulfilled proper demand for payment. As such, the insolvency date measured by Duane Altendorf would be October of 2013.

. . . .

The parties are in agreement that only one insolvency date should be determined and it is appropriate to use the earliest date Grand Forks Bean met the

60-04-02.

definition of being insolvent. The earliest date Grand Forks Bean can be determined to have met the definition of insolvent is October, 2013, following its failure to provide payment to Duane Altendorf after Duane Altendorf made a proper demand for payment. Because an exact date of the first demand was not provided a reasonable estimate is October 15, 2013.

[¶40] We conclude the district court's interpretation of the insolvency date is in accordance with the plain language of N.D.C.C. § 60-04-02 and the court's application of the insolvency date to the circumstances of this case is supported by competent evidence in this record. We are not left with a definite and firm conviction the court made a mistake, and we therefore conclude the court did not clearly err in finding the date of Grand Forks Bean's insolvency was October 15, 2013.

## VI

[¶41] We next consider arguments that some noncredit-sale receiptholders received a different price per hundredweight for their beans.

[¶42] The Estate of Brad Nelson received $33 per hundredweight for some beans, WJS Nelson received $35 per hundredweight for some beans, and Altendorf received $45 per hundredweight for some beans. The district court decided those growers had a cash claim under N.D.C.C. § 60-04-09(4), as opposed to a claim based on scale tickets or warehouse receipts un-der N.D.C.C. § 60-04-09(5). The court explained the formula for payment to receiptholders under the applicable language of N.D.C.C. § 60-04-09(4) and (5):[3]

The distinction between subsection 4 and subsection 5 are the type of claims being paid. Subsection 4 defines the payment method for receiptholders who have sold production to the warehouseman. Subsection 5 defines the payment method for receiptholders who have stored their production with the warehouseman, delivered their production to the warehouseman for marketing that has not yet occurred and/or have a relationship with the warehouseman that has not yet determined the price to be paid for the delivered production. This interpretation is consistent with the North Dakota Supreme Court's prior recognition "that the trust fund exists for the benefit of all unpaid sellers of grain regardless of whether they hold 'cash slips' or 'checks' . . . ." *North Dakota Public Service Comm'n v. Central States Grain, Inc.*, 371 N.W.2d 767, 779 (N.D. 1985). Throughout the *Central States Grain* opinion the North Dakota Supreme Court, when referencing § 60-04-09, identifies two types of receiptholders that are entitled to payment; those who have sold production and those who have their production stored with the warehouseman. Subsection 4 recognizes claims made by receiptholders who have sold production to the warehouse. Subsection 5 recognizes re-

---

**3.** Section 60-04-09, N.D.C.C., was amended effective August 1, 2017, by 2017 N.D. Sess. Laws ch. 417, § 16. *See* ¶ 37 n.2. At the time relevant to this proceeding, N.D.C.C. § 60-04-09 provided, in relevant part:

  4. In case of cash claims or checks, the amount thereof, with interest at the weighted average prime rate charged by the Bank of North Dakota since the date of the insolvency.

  5. In the case of scale tickets or warehouse receipts, the amount thereof based upon the market price prevailing on the date of the insolvency, with interest at the weighted average prime rate charged by the Bank of North Dakota since the date of the insolvency.

ceiptholders who have production stored with the warehouseman.

[¶43] We agree with the district court's interpretation and application of N.D.C.C. § 60-04-09. The court's decision to award these three growers a different price is based on the court's credibility determinations. Evidence in the record supports the court's decision, and we do not reweigh that evidence or reassess the witnesses' credibility. We are not left with a definite and firm conviction the court made a mistake, and we conclude the court did not clearly err in establishing the price per hundredweight for those three growers.

## VII

[¶44] Bremer argues the district court erred in failing to offset service fees agreed upon between Grand Forks Bean and the growers. Bremer claims Grand Forks Bean had a posted policy at the warehouse that beans were accepted subject to a service fee of $.15 per month per hundredweight and the applicable price later marketing agreements provided for the same service fee. Bremer argues the growers owed Grand Forks Bean a service fee offset calculated from the date of delivery through the date the beans were liquidated at the rate of $.15 per hundredweight per month. Bremer claims those offsets should have reduced the amounts payable to the growers.

[¶45] The district court effectively denied Bremer's request for a service fee offset. Bremer has cited no authority requiring a service fee offset against the noncredit-sale receiptholders, and we have found none. Grand Forks Bean did not have a contractual agreement for a service fee offset with the noncredit-sale receipt-

holders, and we conclude the court did not err in denying Bremer's request for a service fee offset from them.

## VIII

[¶46] The PSC claims the district court erred in refusing to decide the value of Amundson's claim from the credit-sale indemnity fund in N.D.C.C. ch. 60-10. On appeal, Amundson's argument involves his status as an entity with a credit-sale contract, and he has not raised an issue about payment under the credit-sale indemnity fund in N.D.C.C. ch. 60-10. Rather, Amundson refused to consent to having the district court address this issue.

[¶47] The district court said it might have decided the issue if there had been proper notice, but without that notice, any indemnity fund claim under N.D.C.C. ch. 60-10 was not part of the insolvency proceeding under N.D.C.C. ch. 60-04. As a grower with a credit-sale contract, Amundson is not precluded from pursuing his claim under the credit-sale contract indemnity fund in N.D.C.C. ch. 60-10. We are not persuaded the district court erred in declining to address this issue in the context of this insolvency proceeding under the applicable provisions of N.D.C.C. ch. 60-04.[4]

## IX

[¶48] Bremer argues the district court erred in awarding the PSC costs and expenses from the trust fund, because the PSC does not have a lien on the trust fund under N.D.C.C. § 60-02-25.1. Bremer argues the trust fund proceeds must be distributed to satisfy Bremer's claim before payment of the PSC's costs and expenses.

4. Section 60-04-04, N.D.C.C., was amended effective August 1, 2017, to require credit-sale claimants to file claims in the context of insolvency proceedings under N.D.C.C. ch. 60-04.

See 2017 N.D. Sess. Laws ch. 417, §§ 14 and 16 (amending N.D.C.C. §§ 60-04-04 and 60-04-09).

The PSC responds it is entitled to costs and expenses from the trust fund proceeds under N.D.C.C. §§ 60-04-03.1, 60-04-09, and 60-04-10.

[¶49] When read together, the language of N.D.C.C. §§ 60-04-03.1, 60-04-09, and 60-04-10 authorizes payment of "expenses" and "costs" incurred by the PSC from the trust fund, and we have held the PSC is entitled to expenses and costs in administering an insolvency trust fund. *Cent. States Grain, Inc.*, 371 N.W.2d at 781; *Valley Farmers Bean Ass'n*, 365 N.W.2d at 548-49. We reject Bremer's argument about the award of costs and expenses to the PSC.

### X

[¶50] We affirm the judgment.

[¶51] Jerod E. Tufte

Daniel J. Crothers, Acting C.J.

William A. Neumann, S.J.

William A. Herauf, D.J.

Daniel S. El-Dweek, D.J.

[¶52] The Honorable William A. Herauf, D.J., the Honorable Daniel S. El-Dweek, D.J., and the Honorable William A. Neumann, S.J., sitting in place of VandeWalle, C.J., Kapsner, J., and McEvers, J., disqualified.